52 N.J. Super. 178 (1958)
145 A.2d 28
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH HAYES, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1958.
Decided October 6, 1958.
*179 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Ernest Fasano argued the cause for appellant.
Mr. Solomon Lautman, First Assistant Prosecutor, argued the cause for respondent (Mr. Vincent P. Keuper, Monmouth County Prosecutor, attorney).
*180 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was tried and convicted in the Monmouth County Court on an indictment charging him with the crime of escape, N.J.S. 2A:104-6, and was subsequently sentenced to a State Prison term of from one to three years. He appeals, claiming that he could not be guilty of the crime charged because at the time of his escape he was being illegally confined in violation of N.J.S. 2A:4-33.
The facts are undisputed. On September 20, 1957 defendant was arrested and charged with breaking and entering and with larceny. The following day the Middletown Township magistrate committed him to the Monmouth County Jail where he was confined in an area known as Bull Pen No. 2. On September 22 it was discovered that defendant was only 17 years old. The magistrate therefore recommitted him, this time to the Monmouth County Juvenile Detention Center. Defendant was thereupon moved to Bull Pen No. 1 which, according to the sheriff, had verbally been designated as the juvenile detention center by some one in the Department of Institutions and Agencies in the course of a telephone conversation with him. There was, however, no official order designating that pen as the center. Bull Pen No. 1 housed some 20 to 22 prisoners at that time, most of them adults who had been convicted of crime or were awaiting trial on criminal charges.
There is nothing in the record or the briefs to indicate that when defendant was moved to Bull Pen No. 1 he knew that this confinement violated N.J.S. 2A:4-33, which reads:

"* * * * * * * *
A child between the ages of 16 and 18 years coming within the provisions of this chapter shall not be placed in any prison, jail, lockup or police station unless there shall be no other safe and suitable place for his detention, and it is necessary for his protection or the protection of the public, and unless when so placed in a jail, lockup or police station it shall be in a segregated section of such premises where the said child cannot have contact with any adult convicted of crime or under arrest.

* * * * * * * *"
*181 Defendant made his escape from the pen on October 3, 1957. We are informed that he did so by utilizing tools brought in to him by visiting relatives and that he had the men in the pen sing to mask the noise of his operations.
It is clear that defendant's confinement in Bull Pen No. 1 violated the quoted statute. The fact that the sheriff had the oral approval of the state agency to use this pen as a juvenile detention center is immaterial. Indeed, the State does not claim that any agency order purported to, nor could it possibly in the face of the statute, authorize defendant's confinement with adult offenders. The State's contention that there was "no other safe and suitable place" for the detention, and that defendant's confinement was for "the protection of the public" and therefore the statute was not violated, is specious. It disregards the conjunctive requirement that the minor be segregated and not "have contact with any adult convicted of crime or under arrest."
The State suggests that defendant's confinement may have been proper under R.S. 30:8-8. That statute directs freeholder boards to arrange places of confinement so as to segregate persons under the age of 18, and goes on to provide:
"* * * If it is impractical to so arrange the building used for such [confinement] purposes, such boards of chosen freeholders shall provide such places as shall be necessary to accomplish the purposes of this section."
In the first place, the State does not attempt to show the impracticability of accomplishing the purposes of R.S. 30:8-8, or of any real attempt to do so. Secondly, as we read this statute, it actually reinforces the mandate of N.J.S. 2A:4-33 by directing freeholder boards to keep persons under 18 "separate and apart from and so that no communication takes place between them and other persons above such age confined therein on a charge or conviction of crime."
The single point raised by defendant on this appeal is that he had a right to escape because, under N.J.S. *182 2A:104-6, his confinement was not "lawful." This statute reads:
"Any person imprisoned or detained in a place of confinement, or being in the lawful custody or control of a penal or correctional institution or of an officer or other person, upon any charge, indictment, conviction or sentence for any crime, * * * who by force or fraud escapes or attempts to escape from such place of confinement or from such custody or control, * * * is guilty of a misdemeanor."
Relying on the word "lawful" in the second clause, defendant attempts to spell out a legislative intent to leave unpunished an escape from a confinement that is not "lawful." It seems almost certain that the Legislature never considered the question, so that any conclusion as to its actual intent would be purely conjectural. The Ohio Court of Appeals, faced with a similar question, elected to read into the statute the requirement of "lawful" confinement, State v. Ferguson, 100 Ohio App. 191, 135 N.E.2d 884 (1955). But see, Bayless v. United States, 141 F.2d 578 (9 Cir. 1944), certiorari denied 322 U.S. 748, 64 S.Ct. 1157, 88 L.Ed. 1580 (1944), applying the expressio unius est exclusio alterius rule in construing the federal escape statute, 18 U.S.C.A. § 753h.
The question presented for resolution appears to be a novel one in this jurisdiction. Defendant cites State v. Williams, 10 N.J. Law J. 293 (Cir. Ct. 1887) (not officially reported). The single paragraph opinion reveals that defendant had been convicted under the Disorderly Act. He was charged with escape and argued that the commitment was defective in that it did not state that he had been convicted, but simply stood "charged" with the offense. The court discharged defendant, holding that "if the commitment was illegal, the defendant could not be punished for embracing an opportunity to escape." The rationale of this determination is not set out, nor are authorities cited. The trial judge distinguished the Williams case because it related to an illegal commitment rather than to an illegal confinement. *183 Defendant, incidentally, makes no claim that his commitment to the Monmouth County Jail was illegal.
Nor is In re Rigg, 95 N.J. Eq. 341 (Ch. 1924), also cited by defendant, persuasive here. The court there held that "The deliverance of a person who is lawfully imprisoned, out of prison, before such person is entitled to such deliverance, is an escape." The court was not considering the legality of the confinement as bearing upon the possible criminal conduct of the prisoner in escaping; rather, it was dealing with the alleged contempt of a solicitor in advising the sheriff to bring the prisoner into court without first delivering to him personally the writ of habeas corpus.
Defendant relies upon the language in the annotation to Kelley v. Meyers, 124 Or. 322, 263 P. 903, 56 A.L.R. 661 (Sup. Ct. 1928), appearing in 56 A.L.R. 666, at page 667 (1928), that
"The very foundation of the crime of escape is the lawful confinement of the prisoner; and therefore it is a general and well-established rule that, when the imprisonment is unlawful, and is itself a crime against the law, the reason which makes flight from prison an offense does not exist. In such a case the right to liberty is absolute, and he who regains it is not guilty of the technical offense of escape. * * *"
The same language is used in 19 Am. Jur., Escape, § 10, p. 365 (1939). However, a review of the cases cited in the annotation and its supplement, 163 A.L.R. 1137 (1946), not only shows a split of authority but leads to the conclusion that the broad language of the annotation does not have substantial support.
Contrast the following statement of the law which appears in the general treatment of the subject found in 30 C.J.S., Escape, § 5(c) (2), p. 1145 (1942):
"It is not a crime to depart from custody for which there is no authority, as where the court exceeds its jurisdiction, or where one is held on a contingent warrant on failure of the contingency, or where a copy of the recognizance is absent, on the surrender of a prisoner by the bail, or where a certified copy of the judgment and order of the court is absent, or where a written `capias' is absent, *184 and this, although the warrant under which the prisoner is arrested is fair on its face. Custody is not, however, rendered unlawful because defendant has been arrested and confined without a warrant, on suspicion of a felony; or because of a mere informality in process, such as the failure of a warrant to state the county in which an offense was committed; or because of the absence of a commitment.
There is authority that a prisoner whose sentence is irregular or voidable may not for that reason defy his guards and run away, but must take other means to test the question. Thus an escape is not justified because the statute under which the prisoner has been convicted is unconstitutional; and, although he is confined under a sentence which would be reversed or set aside if the proper procedure were followed, an unlawful departure from confinement constitutes an escape." (citing cases to the text in the footnotes and 1958 Supplement)
See also 30 C.J.S., Escape, § 10, p. 1147, dealing with the nature and lawfulness of the custody where there is an attempt to escape, and § 15, p. 1148, same subject matter, where there is a prison breach. And see 2 Wharton, Criminal Law (12th ed. 1932), § 2021, p. 2334.
Supporting the text in 56 A.L.R., above, are such cases as People v. Ah Teung, 92 Cal. 421, 28 P. 577, 15 L.R.A. 190 (Sup. Ct. 1891); People v. Clark, 69 Cal. App. 520, 231 P. 590 (D. Ct. App. 1924); and State v. Ferguson, above. But these were situations where the committing authority was wholly without jurisdiction to commit defendant to prison in the first place. Closer to our situation is Cantrell v. State, 21 Ala. App. 558, 110 So. 54 (Ct. App. 1926), where one McCleskey was arrested for drunkenness and put in the town "calaboose," a place of confinement in no way complying with the statutory requirements for the building of prisons. Cantrell later took him to a nearby drug store where the prisoner sobered up; McCleskey then was brought before the mayor, pleaded guilty and paid a fine. The court held that defendant could not be convicted for aiding the prisoner to escape the "calaboose," because an escape could not be committed unless the prison were a "lawful prison, as defined and authorized by state law, * * *."
The cases supporting the position that defendant was guilty of escape include State v. Hatfield, 66 Wash. 9, 118 P. *185 893, 38 L.R.A., N.S., 609 (Sup. Ct. 1911); Commonwealth ex rel. v. Francies, 73 Pa. Super. 285 (Super. Ct. 1919); Whitaker v. Commonwealth, 188 Ky. 95, 221 S.W. 215, 10 A.L.R. 145 (Ct. App. 1920); State v. Cahill, 196 Iowa 486, 194 N.W. 191 (Sup. Ct. 1923); Kelley v. Meyers, 124 Or. 322, 263 P. 903, 56 A.L.R. 661 (Sup. Ct. 1928); Jones v. State, 158 Miss. 366, 130 So. 506 (Sup. Ct. 1930); Aderhold v. Soileau, 67 F.2d 259 (5 Cir. 1933); Commonwealth ex rel. Penland v. Ashe, 142 Pa. Super. 403, 17 A.2d 224 (Super. Ct. 1941); Bayless v. United States, 141 F.2d 578 (9 Cir. 1944), certiorari denied 322 U.S. 748, 64 S.Ct. 1157, 88 L.Ed. 1580 (1944); Stinehagen v. Olson, 145 Neb. 653, 17 N.W.2d 674 (Sup. Ct. 1945); Moore v. Commonwealth, 301 Ky. 851, 193 S.W.2d 448, 163 A.L.R. 1134 (Ct. App. 1946); Tann v. Commonwealth, 190 Va. 154, 56 S.E.2d 47 (Ct. App. 1949); People v. Hinze, 97 Cal. App.2d 1, 217 P.2d 35 (D. Ct. App. 1950).
In Whitaker v. Commonwealth, above, defendant argued that his jail confinement was not legal and he therefore had a right to escape. He claimed that he was practically dragged out of bed on a Sunday night, taken before the county judge who refused to hear him, and sentenced without trial. The court held that:
"* * * It was his duty to submit to the commitment until his status was changed or he was released in a proper manner. `Ubi jus ibi remedium' is a maxim of wholesome application. Whatever his rights, appellant had his legal remedy, and of this he should have availed himself. He was not authorized or justified in leaving the jail of his own volition. * * *"
Another leading case is Kelley v. Meyers, above. It was there held that if the statute under which Kelley had been convicted and was serving at the time of his escape were unconstitutional, as the prisoner claimed, it could not have afforded any justification for his making an escape. Under such circumstances, said the court, if he desired to have the constitutionality of the statute determined, his sole remedy would have been to sue out a writ of habeas corpus. Accord, People ex rel. Haines v. Hunt, 229 App. Div. 419, *186 242 N.Y.S. 105 (App. Div. 1930). Cf. Moore v. Commonwealth, above, holding that the reversal of defendant's conviction of the crime for which he was confined did not justify his escape pending the appeal; accord, Jones v. State, Stinehagen v. Olson, Commonwealth ex rel. Penland v. Ashe, above.
In Tann v. Commonwealth defendant claimed he had a right to escape because the convictions were void for lack of due process in that he had been deprived of his constitutional right to counsel. The court upheld his conviction for escape, declaring that
"* * * When one has been, by authority or command of the law, confined in prison, it is his duty to submit to such confinement until delivered by due course of law, no matter whether he has been committed for a future trial, or for punishment after conviction. It is generally held by the more modern authorities that it is immaterial whether he is innocent or guilty of the original offense in so far as his liability for escaping is concerned. [citing cases]
It would bring the law into disrepute and completely render prison order and discipline unenforceable if prisoners convicted of crime could exercise the right of self-judgment and self-help and be allowed to escape from imprisonment, either because they believe themselves to be innocent, or that their convictions were obtained through legal error. The validity of a judgment often presents a difficult question for experienced lawyers and the courts."
Similar views were expressed by the courts in People v. Hinze, Bayless v. United States and Aderhold v. Soileau, above.
Neither the prospect of unmerited punishment at the hands of prison officers (Johnson v. State, 122 Ga. 172, 50 S.E. 65 (Sup. Ct. 1905)), nor the alleged unsanitary condition of the cell or the inadequacy of food (State v. Cahill, above, 196 Iowa 486, 194 N.W. 191 (Sup. Ct. 1923)) constitutes a defense to a charge of escape. See also in this regard, People v. Whipple, 100 Cal. App. 261, 279 P. 1008 (D. Ct. App. 1929).
Two cases more nearly in point are State v. Garrell, 82 N.C. 580 (Sup. Ct. 1880), and Commonwealth ex rel. v. Francies, 73 Pa. Super. 285 (Super. Ct. 1919). In the first, a prosecution against the manager of a house of correction *187 for negligently allowing a prisoner to escape, it was held no defense that the judgment of conviction should have sentenced the prisoner to jail rather than to the house of correction, the judgment being voidable only, and not void. In Francies the court held that the fact that the prisoner had been sentenced to the penitentiary instead of to the county jail did not entitle him to resolve the irregularity on his own motion by breaking jail.
The great weight of authority, and reason, militate against defendant's claim that he had the right to break jail in the circumstances here present. The Legislature, presumably, sought to deter prisoners from attempting escape because of the great danger of violence such an attempt would involve, and the unquestioned disruption of discipline that would almost inevitably follow. If defendant prevails in this case, that deterrent effect would be weakened.
A prisoner whose conviction or commitment was attended by some irregularity might at best hope for a new trial or a new commitment by resorting to regular and legal means. But if such irregularity were to constitute a defense to an escape, he might well feel he had nothing to lose by taking the law into his own hands and seeking his freedom.
To uphold defendant's contention would be to give prisoners the right of self-judgment and self-help. A minor and unintentional infraction of some legislative command would mean that escaping prisoners could hope to go entirely unpunished. This could only breed disrespect for the law.
Defendant seeks to justify what he did by stressing the sociological and psychological wrong visited upon him by his having been confined with adult offenders. Besides being a post hoc rationalization, the argument must fall for the more fundamental reasons just expressed. The conviction for escape is affirmed.