517 P.2d 98

**ANONYMOUS JUVENILE IN PIMA COUNTY, Juvenile Action No. J–40717–I, Petitioner,**

v.

**Honorable John P. COLLINS, Judge of the Superior Court, Pima County, Arizona, and William Coy Cox, Sheriff of Pima County, Arizona, Respondents;**

**STATE of Arizona, Real Party in Interest.**

**No. 2 CA–CIV 1556.**

Court of Appeals of Arizona, Division 2.

Dec. 17, 1973.

Edward P. Bolding, Pima County Public Defender by Stanton Bloom and Karen Zizmor, Deputy Public Defenders, Tucson, for petitioner.

Dennis DeConcini, Pima County Atty. by Fred Belman, Deputy County Atty., Tucson, for respondents.

Before HATHAWAY, C. J., and KRUCKER and HOWARD, JJ.

OPINION

PER CURIAM.

The petitioner, a 17 year old child alleged to be a delinquent child, is presently being detained in the Pima County Jail pending disposition of a juvenile proceeding. He seeks relief by way of special action in this court on the grounds that his detention is unlawful and in contravention of A.R.S. § 8–226, as amended, and Article 22 § 16, Arizona Constitution, A.R.S. We agree that his detention is unlawful.

A hearing was conducted in juvenile court concerning petitioner's detention and at the conclusion thereof the court ordered that he be detained in the Pima County Jail pending further disposition and that the Sheriff of Pima County make accommodations for petitioner in the trustee's section of the women's section of the jail. The court indicated that it was its understanding that such was the place designated by the Honorable Jack Marks, Superior Court Judge, in a prior case as meeting the requirements of A.R.S. § 8–226, as amended, and Article 22 § 16 of the Arizona Constitution. The court made the requisite finding of reasons for detention and also expressly found "that the Pima County Juvenile Court Center is not able to provide the necessary security for the minor."

A. detention worker testified as to the housing facilities at the detention center and the number of residents at the time. Both the boys' section and the girls' section each contain six security rooms and a living unit. Each security room contains 2 bunks and the living unit was designed to accommodate 18.

At the time of the hearing, there were 18 boys in the living unit and 22 additional boys were being housed[1] in the 9 security rooms (3 of the girls' security rooms plus the six boys' security rooms). The security rooms were accommodating three boys in most of the rooms and some had four.

There were also 22 girls at the detention center who were housed in the girls' living unit and the remaining 3 security rooms. According to the detention worker, some of the boys in the security rooms were qualified to be in the living unit but were not shifted because it was full. Mattresses were being used on the floor of the security rooms to accommodate extra boys and there was no showing that the same arrangement could not be utilized in the living unit. Thus it would appear that one security room could be made available to accommodate the petitioner.

The detention worker also testified that there would be 3 available alternatives as to housing the petitioner: (1) in the living unit with 17 other boys; (2) in a security room by himself; or (3) in a security room with 1 or more others.

At the conclusion of the hearing, the juvenile judge stated:

"It's my further opinion from knowing our physical situation here that I must not only be concerned with the welfare of Mr. S, but also concerned with the welfare of all of the other children here that are already in detention. And I don't want to leave you with the impression that the charge only is the reason I'm doing this, but I think it's one of the things we have to be reasonable about and take into consideration as to what effect that may have on the overloaded population that we have in here already, and take into consideration and take judicial notice of the fact that it only took very little straw to break the camel's back one time before in the recent past in an overloaded situation. And I don't believe, I think adjusting all of the equities of everyone concerned, including the other 64 kids that are already quartered here, that in making the choice of whether to further overload this facility by making the appropriate arrangements for Mr. S. here, or ordering that the sheriff make appropriate arrangements

---

1. Two other boys were temporarily out of residence, one being A.W.O.L. and the other on a temporary release.

for him down there, I think it's more in keeping to do the latter, and I believe that the sheriff can comply with that. He has for us before.

\* \* \* \* \* \*

And I also took into consideration, although I'm certainly not prejudging the case, but I took into consideration Mr. Belman's statement relative to the indication in his opinion that a transfer may be requested.

\* \* \* \* \* \*

. . . if the transfer is made Mr. S. will be most likely transferred to the Pima County Jail at that time, if it were made, even if he were kept here in the meantime.

So that is one of the factors I took into consideration here, also. In other words there is an indication that a probable transfer will be requested, I have to take that into consideration. I can't be blind to it, Mr. Belman has said he is going to make that request.

And the reason why I added that was because yesterday I believe Miss Zizmor asked me would I assure her, in words to that effect, that I was not making this detention order to the Pima County Jail simply based upon the charge. That is of the least consequence in my mind, the charge. What I'm really concerned with is our overloaded population right now. And in our history in the recent past what happened when we did have an overloaded population and brought one more child in with a particular problem that set all hell loose in there. And I don't want that to happen, even though Mr. S. himself might do nothing, his presence there may precipitate things with the other 64. I don't know exactly how they would react. I know that we have some in there that are not so stable as others, and so I'm concerned about that and the overall picture in making this order.

I'm certainly not doing it just because Mr. S. is charged with the particular charge that he is charged with."

Article 22 § 16, Arizona Constitution, provides:

"It shall be unlawful to confine any minor under the age of eighteen years, accused or convicted of crime, in the same section of any jail or prison in which adult prisoners are confined. Suitable quarters shall be prepared for the confinement of such minors."

A.R.S. § 8–226, as amended, mandates:

"A. The board of supervisors shall maintain a detention center separate and apart from a jail or lock-up in which adults are confined where children alleged to be delinquent or incorrigible and within the provisions of this article shall, when necessary before or after hearing, be detained.

B. A child, pending a hearing, shall not be placed in an apartment, cell or place of confinement with adults charged with or convicted of crime."

In the case of Application of Vigileos v. State, 84 Ariz. 404, 330 P.2d 116 (1958), the Arizona Supreme Court agreed that confinement of a minor under the age of 18 in the Arizona State Prison where he mixed with adult offenders contravenes the foregoing constitutional mandate. Other jurisdictions have declared unlawful detention of a juvenile in a jail facility under statutory provisions concerning juveniles similar to our A.R.S. § 8–226, as amended, supra. See e. g., Ex parte Karnes, Ohio App., 67 Ohio Law Abst. 449, 121 N.E.2d 156 (1953); In re Prieto, Dom.Rel.Ct., 49 N.Y.S.2d 800 (1944); State v. Hayes, 52 N.J.Super. 178, 145 A.2d 28 (1958).

In the *Hayes* case, the juvenile was moved from the juvenile detention center to Bull Pen No. 1 of the county jail which, according to the sheriff, had verbally been designated as the juvenile detention center by someone in the Department of Institutions and Agencies in the course of a telephone conversation with him. However, there had been no offical order designating that pen as the center and in fact, it housed some 20 to 22 adult prisoners, most of whom were adults either convicted of

crime or awaiting trial on criminal charges. The court held that the juvenile's confinement violated a statutory provision[2] and the fact that the sheriff had oral approval of the state agency to use the pen as a juvenile detention center was immaterial.

In the case of In re Prieto, supra, the court considered the propriety of using the City Prison as a substitute for adequate temporary detention facilities for delinquent children. In 1942, the New York Legislature had amended Section 82 of the Domestic Relations Court Act, so as to authorize such use. The statute provided:

> "No child coming within the provisions of this act shall be placed in or committed to any prison, jail, lockup or other place where such child can come into contact at any time or in any manner with any adult who has been convicted of crime, or who is under arrest, unless by order of the court and unless it be necessary to secure his safety or that of others or thereby prevent his escape, in which case he shall be segregated from such adult or adults as far as may be possible; * * * "

The New York court held that merely because there were no vacancies at the juvenile detention center, a juvenile could not be detained in the City Prison, stating:

> "In the opinion of the Court, it would be contrary to the spirit of the law and the purpose of Sec. 82, even as amended in 1942, to construe it in such a way as to use the City Prison for the temporary detention of children who would ordinarily be sent to the S.P.C.C.'s but for whom there are no facilities by reason of the over-crowded situation created in large part by the suspension of intake on the part of the State Board of Social Welfare. Sec. 82 must be strictly construed if it is not to be abused, and if the Court is not to condone the return to the use of jails and prisons for children in lieu of the provision of appropriate temporary detention facilities." 49 N.Y. S.2d at 803.

The mandate of our statute is crystal-clear, i. e., exposure to, association with, or any type of contact with adults charged with or convicted of crimes is prohibited. It is true that the petitioner was placed in a cell alone. However, the physical location of the cell was in the trustee's section of the women's section of the Pima County Jail. It was not in a completely separate section of the jail. Thus we see that his mere isolation in a cell did not insulate him from the exposure to adults denounced by the statute. We hold, therefore, that petitioner's incarceration violates the statutory mandate. In so holding, we do not mean to imply that maintenance of a separate juvenile detention center within an existing jail facility, provided the statutory mandate is observed, is impermissible.

It is therefore ordered that the subject order of commitment is set aside and the cause is remanded for further proceedings consistent herewith.

---

2. N.J.S. 2A:4–33, N.J.S.A. provided:
   "A child between the ages of 16 and 18 years coming within the provisions of this chapter shall not be placed in any prison, jail, lockup or police station unless there shall be no other safe and suitable place for his detention, and it is necessary for his protection or the protection of the public, and unless when so placed in a jail, lockup or police station it shall be in a segregated section of such premises where the said child cannot have contact with any adult convicted of crime or under arrest * * * "