STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CLARENCE SMITH AND LEE STANFORD, DEFEND- ANTS-APPELLANTS.

Argued September 28 and 29, 1959—Decided May 23, 1960.

See also 52 *N. J. Super.* 526, 146 *A. 2d* 224.

508

---

*Mr. Alfred C. Clapp* argued the cause for defendant-appellant Clarence Smith.

*Mr. Hymen B. Mintz* argued the cause for defendant-appellant Lee Stanford (*Mr. Hamilton F. Kean* on the brief for both defendants-appellants).

*Mr. Brendan T. Byrne,* Essex County Prosecutor, argued the cause for plaintiff-respondent.

The opinion of the court was delivered by

HALL, J. The defendants appeal as of right from a conviction for first-degree murder in the Essex County Court upon which they were sentenced to life imprisonment by reason of the recommendation of the jury. The theory of the prosecution was felony-murder based upon a killing ensuing from the commission of robbery. *N. J. S. 2A* :113–1 and 2. The death resulted from injuries sustained in a "mugging,"—a term commonly used to describe the vicious act of physical attack upon an isolated pedestrian on a public street at night and the taking of money and effects from his person. It constitutes the felony of common-law robbery.

The State introduced evidence from which the jury could find beyond any doubt the necessary elements of the felony-murder committed by two Negro youths. It was convincingly established by witnesses who were in the vicinity and from medical testimony that the decedent, Carmine Dellorto, about 66 years old, was attacked by two such persons for the purpose of robbery while waiting for a bus at the southeast corner of 15th Avenue and South 10th Street in Newark near midnight on June 13, 1958, that he was knocked down by a strong blow to the face, and that he struck the back of his head on the pavement, sustaining a fractured skull from which he died on the spot within a few minutes. A wallet, which it was shown he had in his hip pocket on leaving the home of a friend in the area a few minutes earlier to walk to the bus stop, was missing from his person.

The substantial issue at the trial was the connection of defendants with the offense. They are Negroes and were 17 years old at the time. (Being under the age of 18, they were juveniles under our law, but subject to prosecution as adult criminals either on their own demand, or, as occurred here, on the discretionary order of the Juvenile and Domestic Relations Court in cases where one 16 or 17 years of age

is an habitual offender or is charged with an offense of a heinous nature under circumstances which may require the imposition of a sentence for the welfare of society. *N. J. S. 2A:4–15; R. R. 6:9–7.*) No witness identified them as the youths involved and implication was made out on their oral and written statements given during a period of questioning at police headquarters several days after the crime and admitted in evidence by the trial judge as voluntary, following a preliminary inquiry which produced sharply conflicting testimony on that issue. Defendants' proofs sought to establish that they never in fact made any admissions of guilt, were actually at their respective homes when the crime was committed and had no connection with it.

It is here urged that the State's proofs were insufficient to warrant the submission of the case to the jury as to Stanford and that the verdict was against the weight of the evidence as to both defendants. Certain other alleged trial errors, chiefly relating to questions of evidence, are also asserted. It is strongly insisted that the statements were inadmissible and the convictions cannot stand because defendants were detained and questioned in police headquarters and dealt with prior to indictment in violation of procedures specified by our statutes and rules and the confessions obtained by means contrary to due process of law under the Fourteenth Amendment of the United States Constitution. Reversal is further claimed on the ground that the trial judge refused to instruct the jury to determine again whether the statements were voluntarily given and to reject them entirely if found not to be of that character.

Consideration of the points raised requires a more detailed recital of events and evidence. Within a few hours after the occurrence, the police obtained the stories of several people who had been in the immediate vicinity at the time, although none had seen the attack. These persons were prosecution witnesses at the trial and their testimony represented the only evidence having any bearing on defendants' connection beyond the statements.

The principal witness was Louis Pizza, a 21-year-old bank clerk, who lived on the south side of 15th Avenue one door east of the South 10th Street corner. Near midnight on the evening in question, he was sitting on the stoop in front of the adjoining building, talking with a friend. (The friend was in service and not available to testify at the trial.) He noticed a man walk past on the sidewalk in front of him going west toward the corner. A minute or two later two colored boys, about 17 years old, passed, walking in the same direction. He did not continue to watch them. In a couple of minutes he heard a noise in the vicinity of the corner which sounded like a crack, "I never heard anything like it," and he and his friend started to get up from the stoop. As they did so, the same two boys came around the corner and passed them, running very fast. The boys continued running to 9th Street, one short block east, where they turned south toward 16th Avenue. Pizza and his friend then went to the 10th Street corner. Just as they got there it started to rain very hard. They found the man who had walked past them a few minutes before (the decedent) lying just south of the corner, with his head out in the street and his feet over the curb.

An important part of Louis Pizza's testimony was the general physical description he gave of the two youths, the only witness to furnish anything at all on this score. Besides giving their race and approximate age, he said one was rather tall and thin, about five feet, eight or nine inches, and the other was shorter and a little stockier. The taller one had "a sort of raincoat or trench coat on, a light or a white one I think it was," and the other was wearing "a sort of tan jacket, * * * a half jacket, * * * a shorter jacket." He thought the shorter one wore a hat. However, at no time, prior to or at the trial, was he asked by the police or the prosecutor to attempt to identify anyone, and he told defense counsel he could not do so.

About the same time Mr. and Mrs. Nicholas D'Andrea were riding in their car north on South 10th Street between

16th and 15th Avenues. The beam of their headlights brought into vision two people bending or stooping over a third lying near the corner. As the car lights illuminated the scene, the two arose and ran around the corner east on 15th Avenue toward 9th Street. Mr. D'Andrea turned right into 15th Avenue and his wife saw them running down the south side of the street. Neither could give any description of the two figures whatever, even as to color, and naturally was never called upon to attempt any identification.

The final person who had a glimpse of the perpetrators of the crime was Jerry Pizza, Louis' younger brother, who was standing in front of a hot dog store at the northwesterly corner of 15th Avenue and 9th Street. He saw two Negro boys, about 17 or 18 years old, running east "pretty fast" on the opposite sidewalk of 15th Avenue. They turned the corner and continued south on 9th Street. Mr. and Mrs. D'Andrea then drove up and "asked me if I saw two young men running, and when I said yes, they said that they had just mugged a man down at the corner." Jerry then started chasing the boys down 9th Street. He never got close to them and when he reached 16th Avenue, they had disappeared from view. A friend of his came along in a car, and they made a search of the neighborhood by that means, in the course of which he saw the two again, coming from Spring-field Avenue at 6th Street and entering a house on 16th Avenue in that vicinity. He then returned to the scene of the crime and gave the information to police officers who had arrived. At the trial he testified he could not identify the fugitives or give any description beyond their race and approximate age observed from across the street as they rounded the 9th Street corner.

The medical testimony established, from an autopsy conducted the next day, that death was caused by a fracture of the skull at the site of a lacerated wound on the back of the head, obviously where the decedent hit the pavement. There were also lacerations and bruises about the lower part

of the nose and mouth, giving rise to an irresistible inference that a blow had been received in that region.

With this information in hand, the Newark police, on Monday following the Friday night of the crime, rounded up some 17 Negro juveniles and questioned them at police headquarters. Included was the defendant Smith. He denied any knowledge of the event and was released. No point is here made with respect to that interrogation.

A week later, on June 23rd, about 4 o'clock in the afternoon, Smith and Stanford were brought to the homicide squad room in headquarters by three detectives for questioning as suspects. No warrant was previously issued. Although the matter was not fully explored at the trial and the record is not entirely clear, it seems apparent this course was followed because one David Parker, an 18-year-old resident of defendants' neighborhood who had been questioned in headquarters earlier that same day about this and other "muggings," told the police defendants had recounted to him the morning after the crime that "they got themselves a cat at 15th Avenue and 10th Street last night."

Smith was less than three months short of being 18 years of age; Stanford had become 17 only the month before. The police were aware of their juvenile status. According to the evidence at the trial, Smith was five feet four inches in height and about 132 pounds in weight. Stanford was five feet seven inches or so tall and weighed 147 pounds. He had gone as far as the 11th grade in school and Smith at least the 9th grade. Stanford had been employed in a manufacturing plant in the city for about nine months at wages of $44 per week. Smith had no steady job, but did painting and work for a landscaper when such work was available. There is no indication they were not of normal mind and will. They had known each other for a dozen years and were intimately acquainted. Stanford lived with his family on Camden Street about a block from the home of Smith's parents on Bergen Street near 13th Avenue, where the latter had resided prior to his marriage

13 days before. At the time Smith and his wife Ruth were living on Morris Avenue two or three blocks southeast of his parents' home. His wife's family lived a block or so south at number 195 on the same street. Residing in the latter house also was Smith's wife's aunt, Betty Brown Bey, a young girl with whom Stanford had been "going" for about two years. All the houses mentioned are within four blocks or so of each other. The scene of the crime is in the same section of the city but about three blocks south and eight or nine blocks west of the area of these residential locations. It should also be noted, the importance of which will appear, that Betty had a married sister, referred to as Jewel, Juliette or Florine, who lived on 15th Avenue near South 15th Street, about five blocks further west of the spot of the killing and on the opposite side of the avenue.

The questioning of defendants at police headquarters fairly soon produced, according to the detectives, oral admissions of guilt, first by Stanford and then by Smith. The preparation and signing of written confessions followed, on one of which it is set forth that it was sworn to on June 24 at 1:24 A. M. and on the other, at 1:27 A. M., approximately 9½ hours after the arrival at headquarters. The conflicting testimony relating to the obtaining of the statements, given at the preliminary inquiry on admissibility, will be summarized in our discussion of the points raised with respect thereto. Immediately thereafter defendants were removed to the Youth House, the approved Essex County facility for detention of juveniles pending hearing in the juvenile court. There is no suggestion they were ever questioned again.

On June 27, a complaint in the Essex County Juvenile and Domestic Relations Court was sworn to by a detective, alleging delinquency in that defendants robbed and killed Mr. Dellorto. The matter came on for hearing on July 3, presumably as scheduled by the court. They were represented by counsel of their own choosing (not the attorneys who

appeared at the trial and on this appeal), who had conferred with them at the Youth House shortly after they were confined there.

At the outset of the hearing, the judge, after reading the complaint and *R. R.* 6:9–7 to defendants, announced that it appeared to his satisfaction they were charged with a heinous offense and that in addition the court records before him indicated they were habitual offenders. He then said he was referring the case to the county prosecutor, for disposition as an adult crime, pursuant to *N. J. S.* 2A:4–15 and the implementing rule above cited, since under the circumstances the imposition of a sentence rather than the disposition permitted under the Juvenile and Domestic Relations Court Act might be necessary for the welfare of society. Although no stenographic record was made, it would seem defense counsel did not challenge the correctness of the basis of the court's determination, but sought to present testimony that defendants were not involved in the crime and contended that any determination as to transfer should not be made until after such evidence had been submitted and considered. The judge ruled that it was not necessary to take testimony since the *charge* itself was of a heinous offense, *i. e.*, that such was all that was involved in such a hearing and guilt or innocence was not to be inquired into. It is not now claimed the case should not have been transferred for prosecution. At the same time the court ordered defendants removed from the Youth House to the Essex County Jail, finding there was no other safe or suitable place for their detention. They were kept there until trial in a separate section reserved for juveniles.

Subsequently the present indictment for murder was returned by the Grand Jury. Defendants were not at any time brought before a court for the purpose of a preliminary hearing or examination on the question of probable cause that an offense had been committed and that they had committed it.

Prior to trial present counsel moved in the County Court to dismiss the indictment on the ground, among others, of

the alleged invalidating effect of certain of the pre-indictment procedures in the light of our rules. It was heard by the judge who later presided at the trial and denied in an opinion reported at 52 *N. J. Super.* 556. The points urged on the motion will be considered so far as pertinent in a later portion of this opinion.

Thereafter, on defendants' motion, the State was ordered to furnish extensive particulars of the charge and its proposed proofs, including the names and addresses of all witnesses and copies of defendants' statements. Defense counsel were also authorized to engage, at public expense, the services of a qualified physician to study the autopsy report and assist in the preparation and trial of the case.

To return to the evidence at the trial,—at the conclusion of the inquiry on admissibility of the statements, which had been had in the presence of the jury, the trial judge stated he found the statements to be "voluntary" and so told the jury. He further instructed it, however, and repeated in the charge, that it should take into consideration all the facts and circumstances surrounding the giving and obtaining of the statements in carrying out its function of determining the weight and belief to be given them. As has been indicated, he also expressly refused to charge defendants' request that the jury redetermine the question of voluntariness.

The written confessions thereafter read to the jury may be summarized. Smith's said that on June 13, his wife went to her mother's at 195 Morris Avenue at 4 P. M. and he went there about 9:30 P. M. Stanford was there but his "girl friend" Betty was not. Stanford asked him to walk to Jewel's (Betty's sister) house at 15th Avenue and 15th Street where Betty was. They left 195 Morris Avenue at 10:30 and went to Jewel's, stopping at a hot dog stand *en route*. They stayed at Jewel's until about midnight and then walked down the north side of 15th Avenue until they passed 10th Street, when they crossed to the south side and walked (back) towards the 10th Street corner and

stopped. "There was a white man standing on the corner and he looked like he was waiting for a bus, we stood on the corner for a few minutes and the white man turned around and looked at us. At that time I was about three feet from the man and he was right alongside of me, while the man was looking at us I stepped up and I hit the man on his jaw with my right hand and the man went down * * *. We had made no plans to rob this man but when we got on the corner Lee said 'Smith do you want to get this man' and that is the time I struck the man * * *. Lee searched the man and I seen a car's headlights and the car was about ten or fifteen feet away and I told Lee there is a man in the car and both of us started to run down 15th, Ave., towards 9th, street, and turned right on 9th, street and left at 16th, ave., and left at Camden, street and we stopped and sat on a porch as it was raining." Smith said he there asked Stanford what he got out of the man's pocket. The latter replied $12, of which he gave Smith $6. Smith saw no wallet. Stanford then went on home and Smith returned to 195 Morris Avenue, picked up his wife and went to his home. He said he was wearing a black three-quarter length leather jacket and a black hat and that Stanford had on a gray raincoat and a black hat.

Stanford's confession differed in some details. He does not state when the two left 195 Morris Avenue and makes no mention of Smith's wife being there, saying Smith thought, when he went with him to Jewel's, that his wife might be at that place. He says they left Jewel's about 11 P. M. and after they crossed to the south side of 15th Avenue east of 10th Street "Clarence turned around toward 10th Street and he said come on or look athere and we started back toward 10th, Street, and I asked him where he was going and before he answered me we were at the corner * * * and old man had just walked up * * *. I seen Clarence strike the old man with his fist one punch and the old man fell on his back * * *. Just as the man fell I got there and I bent down over the man and

Clarence was already bent down over the man and I saw Clarence take a * * * old leather wallet from the man's hip pocket." The story of the flight also varied. Stanford said they stopped in a hallway on 16th Avenue "because somebody was chasing us and it had started to rain." Thereafter they ran down 16th Avenue to Fairmount Avenue and over that street to South Orange Avenue, during which Smith gave him the wallet which was empty and which he threw away. (There was no testimony the police had found the wallet or had even made an unsuccessful search.) They split up at South Orange Avenue and Stanford went home. He said he was wearing a dark raincoat and no hat and Smith was wearing a light gray jacket and a dark hat. (At the trial Stanford testified he was wearing either a white or gray raincoat and a hat; Smith denied telling the police the clothes he or Stanford had on.)

Prior to the reading of the written statements to the jury, three of the detectives who had participated in the questioning took the stand to recount the oral admissions made by defendants during the earlier part of the interrogation, which, while generally similar to the later prepared written statements, in some respects implicated Stanford further than his confession. Their testimony in the latter respect, entirely from recollection, they having made no notes at the time, was to the effect that about 6 P. M. on the day of the questioning, one of them told Stanford that Parker had related to him the meeting with Stanford and Smith the morning after the crime at which defendants recounted the event. At first Stanford denied it but later, according to the detectives, admitted that they did so tell Parker (this phase was never further explored at the trial) and that they did commit the crime. The detectives say Stanford then went on to detail the events as recounted in his written statement with the significant addition that, while he and Smith were walking east on the north side of 15th Avenue between 10th and 9th Streets, they saw a man walking west on the opposite sidewalk, whereupon Smith is

reported to have asked Stanford "Shall we get this cat?," after which Smith crossed the street, Stanford followed him and they turned and walked behind the man to the 10th Street corner. Why this highly incriminating recital was not included in his subsequent written confession was not explained, although it was not made to the same detective who composed the document.

Defendants' case, beyond character witnesses and denials of having admitted any guilt to the police, was based on an alibi. They both testified they left 195 Morris Avenue about 8 o'clock or shortly before and walked the 12 blocks or so to Jewel's to see Betty, arriving there before 8:30 and, after watching television, started back about 9:30 or so. They reached 195 Morris Avenue before 10 o'clock. The route they described did not take them past the 10th Street corner. Stanford said he stayed a few minutes and Smith then walked part way home with him. He claimed he was home by 10:30, since he had to go to work the next day, although it was a Saturday and not a work day. Smith said nothing on direct examination about the subsequent walk toward Stanford's house, but told about it on cross-examination (during which he altered somewhat the various times to which he had testified on direct examination) as well as of an attempted visit to his mother's home (neighbors told him his family was in bed) before he returned to 195 Morris Avenue the second time. He placed this arrival at 10:30 and said he stayed there until 11:30 or so. He then went to his own rooms with his wife, reaching there before 12 o'clock. Members of Stanford's family and Smith's wife and her relatives, except Jewel who was ill at the time of the trial, generally supported the testimony as to times of leaving and arrival at the various houses mentioned.

I.

We will deal first with the grounds urged for reversal apart from those relating to the pre-indictment procedures and the oral and written statements of guilt.

Defendant Stanford contends that his motions for judgment of acquittal at the close of the State's case and after the evidence of both sides was concluded should have been granted because the proofs were insufficient to warrant his conviction. *R. R.* 3:7–6. It is claimed that, even conceding his confessions, he was no more than a bystander at the scene and did not participate in the crime committed by Smith. If such be the unquestionable state of the proofs, Stanford could not be found guilty. *State v. Fox,* 70 *N. J. L.* 353 (*Sup. Ct.* 1904). But it is equally elementary in felony-murder that when two persons agree to rob another and only one strikes the fatal blow, both are guilty. All actually taking part in the perpetration of the felony are treated alike, even though one be not physically present at the scene, and every person aiding and abetting in its commission is punishable for the consequences as a principal to the same extent as the actual murderer. *N. J. S.* 2*A*:85–14; 2*A*:113–4. *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1947), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773 (1948), rehearing denied 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782 (1948); *State v. Turco,* 99 *N. J. L.* 96 (*E. & A.* 1923); *State v. James,* 96 *N. J. L.* 132, 153 (*E. & A.* 1921); 2 *Schlosser, Criminal Laws of New Jersey,* § 1394 (*Rev. ed.* 1953). And it is likewise well established that proof one "is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same." *State v. DeFalco,* 8 *N. J. Super.* 295, 299 (*App. Div.* 1950); *cf. State v. Corby,* 47 *N. J. Super.* 493, 499 (*App. Div.* 1957), affirmed 28 *N. J.* 106 (1958).

The test on a defendant's motion for judgment of acquittal is whether there is any legal evidence before the jury, viewing the proofs in their entirety and giving the State the benefit of all proper inferences therefrom, from which a conclusion of guilt could properly be drawn. *State*

v. *Dunphy*, 24 *N. J.* 10 (1957); *State v. Kollarik*, 22 *N. J.* 558 (1956); *State v. Rogers*, 19 *N. J.* 218 (1955). The State's position was that defendant's acted in concert.

At this point we should digress to say that the indictment was entirely adequate (*State v. Bunk*, 4 *N. J.* 461, 466 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950)) and the prosecutor's opening to the jury outlining the proofs he expected to introduce was clearly sufficient to present this theory. Defendants' additional point that an earlier motion for acquittal made following the opening should have been granted on the ground of some deficiency in these respects is utterly without merit. We may further interpolate to say that we also find no possible basis for the additional claim of error in the denial of a further motion made on behalf of Stanford at the same time to require the prosecution to elect whether it was proceeding on a theory of robbery or attempted robbery. Both were mentioned at one point in the opening, but the prosecutor clearly went on to say the State would show that defendants took a wallet from the decedent's person. The statute makes the killing murder and in the first degree whether the felony is completed or only attempted. *N. J. S.* 2*A*:113–1 and 2. Moreover, defendants could not conceivably have been prejudiced by the matters which were the subject of the two motions just referred to.

Concerted action does not have to be proved by direct evidence of a formal plan to commit a crime, verbally concurred in by all who are charged. The proof may be circumstantial. Participation and acquiescence can be established or inferred from conduct as well as from spoken words. *Cf. State v. Cerce*, 22 *N. J.* 236 (1956). Here there can be no doubt Stanford's motions for acquittal were properly denied although he did not personally strike Mr. Dellorto and there is no proof he orally expressed agreement in the proposed robbery. Considering the legally applicable proof at the end of the State's case most favorably to it, there is shown between his oral and written statements, assuming

them to have been properly admitted, that he followed Smith from the north to the south side of 15th Avenue after they saw a man walking west on the south side and after Smith had said "Shall we get this cat?," that he joined Smith in trailing the man to the South 10th Street corner, that he stood alongside when Smith struck the blow, that he at once bent down to go through the victim's pockets and found Smith already doing that very thing, that they both fled when the automobile headlights illuminated the scene and that Smith gave him the wallet during the flight, which he opened, found empty and threw away. At that stage of the trial, there was also sufficient independent proof, although the question is not explicitly raised, of facts and circumstances strengthening the confession and tending to generate a belief in its trustworthiness (*State v. Johnson,* 31 *N. J.* 489, 502–503 (1960); *State v. Lucas,* 30 *N. J.* 37, 56 (1959)) to be found in the testimony of the Pizza brothers and Mr. and Mrs. D'Andrea previously summarized. The situation was no less strong from the prosecution standpoint at the end of the entire case for the defense was primarily alibi. There was clearly enough for the jury to find, under appropriate instructions as to the requisites of culpability on the part of Stanford which the trial judge carefully gave and are not challenged, that he was a willing participant acting in concert with Smith and so equally guilty of first-degree murder.

We next come to the argument that the verdict was contrary to the weight of the evidence as to both defendants. The contention seems to be that the jury mistakenly believed the confessions and wrongly failed to give credence instead to defendants' denials of guilt and alibi testimony. A jury verdict shall not be set aside on this ground by an appellate court "unless it clearly and convincingly appears that [it] was the result of mistake, partiality, prejudice or passion." *R. R.* 1:5–1(*a*). It is, of course, axiomatic that we may not, in implementation of this rule, weigh the evidence and substitute our judgment for that of the jury or overturn a verdict

simply because in our opinion we would, or a jury should, have found otherwise on the same evidence. (We do not mean to intimate any view as to whether we would have done so here.) Our review is limited to correcting injustice where there is an inescapable conclusion of obvious error by the jury. *State v. Welsch,* 29 *N. J.* 152 (1959); *State v. Landeros,* 20 *N. J.* 76 (1955), *certiorari* denied 351 *U. S.* 966, 76 *S. Ct.* 1025, 100 *L. Ed.* 1486 (1956).

The finding of guilt here obviously must rest on the oral and written confessions of defendants. Without them, the prosecution clearly had not made out a case for there was not sufficient extrinsic evidence to identify them as the perpetrators. Enough independent proof as to probable trustworthiness of the statements had been introduced, however, to meet requirements of admissibility on that score. It will also be noted that the statements are at variance in a number of details and, as is frequently the case, each defendant sought to place a greater *onus* on the other with respect to certain aspects than the other was himself willing to admit. But Smith confessed he struck the blow in aid of robbery, and as has been pointed out, Stanford sufficiently implicated himself. The trial judge on numerous occasions meticulously cautioned the jury that it could consider admissions only as against the one making them and no complaint is asserted in that connection. If the oral and written confessions were correctly found to be "voluntary," it was a question for the jury whether it would believe the individual admissions made therein in the light of all the proofs, including the circumstances under which they were obtained, or whether it would give controlling weight to defendants' evidence seeking to establish they had no connection with the offense. The issue was entirely one of credibility for determination by the trier of the facts and an appellate court cannot, in the proper exercise of its review function in such a situation, say that this guilty verdict was the result of mistake or prejudice, despite the

relative paucity of corroborative proof. *Cf. State v. Cole, supra* (136 *N. J. L.* 606).

Defendants further assert reversible error in the admission of two sets of black and white photographs. One group was of decedent's body as found at the scene and the other, taken in the morgue prior to autopsy, showed the condition of the face and a large laceration on the back of the head. It is urged that their introduction was unnecessary to establish the State's case and calculated to arouse the passions of the jury. Admission of photographic evidence, properly proved and having probative value, even if somewhat inflammatory, in color and only cumulative, is mainly within the discretion of the trial judge, whose ruling will not be overturned save for abuse, as where logical relevance will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture. *State v. Smith,* 27 *N. J.* 433, 448–449 (1958), *certiorari* denied 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed. 2d* 103 (1959); *State v. Bucanis,* 26 *N. J.* 45, 52–54 (1958), *certiorari* denied 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed. 2d* 1160 (1958). Here we find no semblance of any abuse. All such photographs are bound to be unpleasant, but these are not unduly gruesome. They had important probative value since neither the nature of the attack nor the cause of death was conceded. In fact defendants sought to suggest the demise might have resulted from an internal condition unrelated to a striking of the back of the head on the pavement following a knock-down blow to the face.

Finally, under this head, is to be considered the contention that the trial judge erred in excluding evidence of Stanford's financial condition at the time of the crime. He had testified of his employment in a factory for several months at wages of $44 per week. He was then asked whether he had a bank account and, before an objection was interposed, answered in the affirmative. The court sustained the objection but did not strike the answer. Although no further inquiries in exploration of the subject were pur-

sued, we shall assume they would have been but for the court's ruling on the initial question. It is urged, as it was to the trial judge, that the evidence was relevant as indicating he had no financial motive to participate in a robbery. The problem has apparently never been passed upon in this State. Professor Wigmore supports admissibility and indicates such is the majority view. 2 *Wigmore, Evidence,* § 392, *p.* 343 (*3d ed.* 1940). Even if the evidence should have been received, it is not cause for reversal unless "it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury." *R. R.* 1:5–1(*a*). We cannot conceive any such prejudice here. The assumed subject matter of the probable further questions was of relatively insignificant probative weight. Moreover, the existence of the bank account remained before the jury, which also had the evidence of Stanford's steady employment and testimonials to his good reputation from several witnesses. The action of the trial court in this respect did not amount to reversible error. *Cf. State v. Butler,* 32 *N. J.* 166 (1960).

## II.

Defendants' point asserting invalidating effect of the pre-indictment procedures is captioned in this language: "The procedures employed by the State prior to the indictment were so defective and fundamentally unfair as to warrant reversal." The course of events between the time defendants were picked up by the police for questioning and the return of the indictment has been previously detailed. Three phases thereof are contended to have been unlawful: the detention at police headquarters; failure to accord a preliminary hearing and examination; and unnecessary delay in bringing defendants before a judicial officer.

It should be noted at the outset that the claim of invalidation is based on alleged violations of our procedural rules alone and not on constitutional grounds. Also im-

portant is that defendants urge illegality and reversal on the strength of the claimed derelictions *per se,* quite apart from the matter of admissibility of the confessions. In fact, they were not expressly asserted as bases to exclude the statements, it only being argued at the conclusion of the preliminary inquiry that the State's burden of establishing voluntariness was thereby made heavier. That whole subject will be considered under the next heading.

Defendants' brief does not specifically allude to any action of the trial court where the questions now urged were raised and ruled upon adversely. Our examination of the record discloses none except the denial of the pretrial motion to dismiss the indictment, which is not referred to in the brief. There the claims now made were essentially set forth among the grounds listed in the notice. The court's opinion (52 *N. J. Super.* 556) does not indicate, however, that all were pressed or passed upon. Nonetheless, in view of the importance of the issues, we will consider them fully as here presented. To place them in proper focus for doing so, brief reference must first be made to the procedural pattern prescribed by our rules in juvenile matters.

Two basic methods of commencing proceedings in the juvenile court are provided. There is no distinction whether the juvenile is under 16 years of age or between 16 and 18. The first means, with which we are not concerned, is initiated by the filing of a complaint or preliminary notice, followed by the issuance and service on the juvenile and his parents of a summons for a hearing on the merits of the case unless the judge decides *ex parte* in advance that no cause exists for action by the court. *R. R.* 6:8–1, 2, 4 and 5. No detention is involved prior to the hearing unless the judge determines that immediate custody is in the public interest, when he may issue a warrant in lieu of summons, under which the offender is detained pending the hearing. *R. R.* 6:8–6.

The other method, of pertinence here, concerns commencement of a proceeding by taking into custody without

process. The rules expressly cover only one situation, *i. e.,* where a peace officer actually observes conduct amounting to juvenile delinquency. *R. R.* 6:8–3(*a*) (see also *N. J. S.* 2A:4–33, third paragraph) states:

"Any duly appointed peace officer may take into custody without process any juvenile who in the opinion of the officer, is engaging in conduct defined by law as juvenile delinquency. Such action shall not be construed as an arrest but shall be deemed a measure to protect the health, morals, and well-being of the juvenile."

As we will shortly point out, this rule is not exclusive and does not preclude a police officer from taking into custody a juvenile he has reasonable grounds to believe has committed a high misdemeanor even though not in his presence. If the juvenile so detained is *under* 16 years of age, the officer *shall,* unless it is deemed impracticable or is otherwise ordered by the court, release him in the custody of the parent, guardian or custodian, including a probation officer, on written promise to be responsible for his presence in court at the time fixed. *N. J. S.* 2A:4–32. It will be noted formal detention pending hearing is generally not to be had unless ordered by the court. On the other hand, where the apprehended juvenile is 16 or 17 years old, as in our case, he *may* be released in the custody of a probation officer or other court-designated person or taken home and released in the custody of his parents, unless *"the nature of the offense is such as to require the immediate detention of the juvenile."* In such event, "the officer taking the child into custody shall make immediate arrangements to have the juvenile placed in a detention facility approved by the court." *R. R.* 6:8–3(*b*) and (*c*). It will be noticed no order of a judge is required for such detention; the responsibility is placed on the apprehending officer. He or his superior is directed to file a complaint with the court thereafter. *R. R.* 6:8–3(*d*). Detention obviously continues until the hearing on the merits, which is to be held at a date no later than is required to make a full investigation

of the charges and any necessary examinations. *R. R.* 6:8–7(*b*) and (*c*). There is no provision requiring production of the detained juvenile before a judicial officer in advance of hearing comparable to the procedure for preliminary hearing and examination in the case of an adult charged with crime (*R. R.* 3:2–3), although the statute provides that any detention may be terminated in advance of the hearing by order of the court, thereby authorizing an application on behalf of the juvenile for that purpose. *N. J. S.* 2*A*:4–32, second paragraph.

The place and manner of juvenile detention are governed by both statute (*N. J. S.* 2*A*:4–33) and rule (*R. R.* 6:8–7(*a*)), practically identical in their provisions. The rule specifies that "[n]o juvenile under the age of 16 years shall be detained or placed in any prison, jail, lockup or police station" and that where over that age he "shall not be placed in any prison, jail, lockup or police station unless there shall be no other safe and suitable place for his detention, and it is necessary for his protection or the protection of the public, and unless when so placed * * * it shall be in a segregated section" where there cannot be contact with any adult convicted of crime or under arrest.

The reason for the general pattern of this pre-adjudication procedural framework, omitting as it does many of the steps required in adult criminal causes, is to be found in the basic purpose and principle of our Juvenile Court Law. This is directly expressed in the Juvenile Court Law itself which states, as enacted in 1929 when jurisdiction was limited to those under 16 years of age: "that children under the jurisdiction of said court are wards of the state, subject to the discipline and entitled to the protection of the state, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them." *L. 1929, c.* 157, § 1; *N. J. S.* 2*A*:4–2. The extension of the age limit to include those of ages 16 and 17 in 1943 (*L. 1943, c.* 97, with further amendment by *L. 1946, c.* 77) was upon an intermediate approach under

which offenders of those ages could be dealt with either as adult·criminals or juvenile delinquents at their own choice or in the discretion of the court depending on their prior records or the character of the offense. But until the court makes the determination to transfer the matter for treatment as an adult or the offender demands it (and no law enforcement officer can well know in advance whether such will or will not occur), the procedural course must necessarily conform to the protective approach rather than the punitive. See *State v. Van Buren,* 29 *N. J.* 548, 553–554 (1959), in which this court was concerned with the propriety of the transfer for adult prosecution of a charge against one 17 years of age amounting to felony-murder. See also *In re Smigelski,* 30 *N. J.* 513, 520–521 (1959).

Defendants' adjective contentions must further be viewed in the light of the instant facts that the police were concerned with a brutal crime which had resulted in death, of a type all too common on the streets of our urban areas, and most difficult of solution in view of the circumstances of its commission, absent immediate capture of the perpetrators or clear description and identification by the victim or bystanders, and that they had hearsay information in hand, perhaps reliable and perhaps not, to the effect that these two 17-year-olds had admitted culpability. The authorities had a definite obligation of the highest order to the public to run down every lead and use every legal means to discover and apprehend the perpetrators and an equal duty to these suspects, particularly in view of the nature of the incriminating information, not to subject them to any kind of a formal charge without further investigation. *Cf. Goldsmith v. United States,* 277 *F. 2d* 335 (*D. C. Cir.* 1960). And the police could not know whether, if and when there was enough to fairly charge the defendants as the guilty parties, the juvenile court would later direct adult prosecution or retain the matter for protective and rehabilitative treatment under the Juvenile Court Act. We conceive that the law enforcement officers were entirely justified, and in

fact required to handle and treat defendants as juveniles until the juvenile court determined whether or not it would retain jurisdiction. The procedural objections therefore boil down to a question of deciding if the police conformed to the requirements applicable to 17-year-olds involved in a most serious offense as prescribed by our juvenile court rules or otherwise.

Defendants first urge there was no right to take them to police headquarters without a warrant, on the ground that *R. R.* 6:8–3(*a*) forbids taking into custody without process unless the officer actually sees the commission of the act. This amounts to saying that a policeman could not apprehend on the spot a juvenile who an eyewitness has told him just shot someone, while he might do so if he sees the boy throw a stone through a window. The rule does not have that connotation and to so interpret it would amount to a grave disregard of the public interest where serious offenses are involved. It is the unquestionable law of this State, as at common law, that a peace officer may arrest without a warrant, and indeed it is his duty to do so, where he has reasonable cause to believe a high misdemeanor has been committed and that suspicion attaches to the person arrested. *State v. Genese,* 102 *N. J. L.* 134, 142–143 (*E. & A.* 1925); *cf. In re Sifola,* 101 *N. J. Eq.* 540 (*Ch.* 1927); 6 *C. J. S. Arrest* § 6*b*. There is no policy reason why the rule should not be as applicable to a 17-year-old juvenile offender as in the case where he is an adult of 18 years. The officer might well not be able to differentiate between them. Likewise, no sound reason exists why the common-law right reposing in peace officers to arrest without a warrant for a misdemeanor committed in his presence, at least one involving a breach of the peace (6 *C. J. S. Arrest* § 6*c*), and the statutory power to arrest for disorderly conduct occurring before him (*N. J. S.* 2*A*:169–3) should not also apply with respect to juveniles.

In fact, the rule was not intended to prescribe exclusively concerning the right to take into custody without process in

juvenile situations. Its object was really to extend the authority to cases of certain acts of delinquency specified in *N. J. S.* 2A:4–14 which do not amount to misdemeanors or disorderly conduct. Without the rule he would be powerless in such situations where prompt action may well be necessary. In other cases he derives his authority to take juveniles into custody without a warrant from the general law.

Assuming then that the bringing of defendants to police headquarters amounted to an arrest or a taking into custody, no warrant was required and the action was lawful. If it did not amount to that, obviously there is no problem. The State has in its brief, however, referred to what took place here as an arrest and we will for present purposes acquiesce in that characterization, especially since defendants were prime suspects by reason of the implicating information in the possession of the police and since it would appear they were in no position either to refuse to accompany the police or to leave headquarters any time they wished. *Cf. Cannon v. Krakowitch,* 54 *N. J. Super.* 93 (*App. Div.* 1959). See *"Prearraignment Interrogation and the McNabb-Mallory Miasma,"* 68 *Yale L. J.* 1003, 1018 (1959).

It is next suggested that, regardless of the legality of the apprehension without process, *R. R.* 6:8–3(*c*) requires that defendants should have immediately been placed in the approved juvenile detention facility. We take this to mean that, being juveniles, they could not properly be taken to police headquarters at all or questioned concerning the crime. The contention is a far-reaching one and we cannot agree with it on any score.

It is eminently clear to us that *N. J. S.* 2A:4–33 and *R. R.* 6:8–7, in prescribing that juveniles shall not be detained or placed "in any prison, jail, lockup or police station" except under certain conditions, has reference only to those situations where confinement is necessary pending a hearing and disposition in the juvenile court (which as we have intimated does not ordinarily take place until some

little time after a juvenile complaint has been filed) or after a hearing at which institutional commitment has been ordered. *R. R.* 6:9–11(*d*). *Cf. State v. Hayes,* 52 *N. J. Super.* 178 (*App. Div.* 1958). The rule does not apply where presence in the places named is only for a temporary purpose such as investigation or interrogation. Likewise the requirement of segregation from adults convicted of crime or under arrest has no pertinency, even though we note the police in the instant case went to great pains to attempt to show in their testimony on the preliminary inquiry, quite incredibly we believe, that no adult criminals or suspects were present in the squad room during the questioning.

Furthermore, we do not conceive that *R. R.* 6:8–3(*b*) and (*c*), in speaking of an officer who has taken a juvenile into custody without process making "immediate arrangements" to have him removed to his home or placed in an approved detention facility, requires that such must necessarily be done before the police are afforded a reasonable opportunity to question, where that course is desirable or important. Especially is this true in a situation like the instant one where the crime was most serious and the police information of somewhat doubtful character. Under such circumstances, confinement, even in a juvenile detention facility to await juvenile court hearing, is not justified in the absence of something more trustworthy than hearsay. Suspects might well be able to satisfy the authorities of their innocence and be entitled to be released completely as a result of the interrogation. And, of course, as will be more fully developed under the next heading, any questioning must be confined to such limits of time and be conducted in such a manner that fair treatment is given, lest any admissions made at such a session be held inadmissible in evidence at a subsequent trial.

Although defendants do not explicitly say so in their brief, it appears nonetheless to be suggested that at least the spirit of our juvenile rules precludes police questioning of juvenile suspects. We should consequently make

it clear that our practice does not contemplate any such blanket prohibition. Speaking generally, talking to people and asking them questions, whether they be suspects or not, is a standard and most essential element of crime solution and law enforcement. While police brawn and bluster to extort confessions cannot be a substitute for brains and leg work and will not be countenanced, the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned. This right in the authorities has always been assumed in this State, even when the purpose may have been to attempt to obtain an admission of guilt, and the assumption tacitly runs through all of our decisions dealing with questions of admissibility of confessions claimed to have been coerced during such a process. See *e. g., State v. Cooper,* 2 *N. J.* 540 (1949); *State v. Pierce,* 4 *N. J.* 252 (1950); *State v. Bunk, supra* (4 *N. J.* 461); *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Grillo,* 11 *N. J.* 173 (1952); *State v. Wise,* 19 *N. J.* 59 (1955). It has been held that such is not *per se* illegal either as a matter of common law or of due process under the Fourteenth Amendment, *Lyons v. State of Oklahoma,* 322 *U. S.* 596, 601, 64 *S. Ct.* 1208, 88 *L. Ed.* 1481, 1485 (1944), even where the person was denied the right to communicate with or have counsel present during the interrogation. *Crooker v. People of State of California,* 357 *U. S.* 433, 78 *S. Ct.* 1287, 2 *L. Ed. 2d* 1448 (1958); *Cicenia v. LaGay,* 357 *U. S.* 504, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523 (1958). In *Cicenia,* involving a review by *habeas corpus* of a criminal proceeding had in this State, Mr. Justice Harlan commented:

"* * * it can hardly be denied that adoption of petitioner's position would constrict state police activities in a manner that in many instances might impair their ability to solve difficult cases * * *.

* * * Such a holding [that denial of a request to confer with counsel during police questioning violates due process], in its ulti-

mate reach, would mean that state police could not interrogate a suspect before giving him an opportunity to secure counsel. Even in federal prosecutions this Court has refrained from laying down any such inflexible rule. See *McNabb v. United States*, 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819, *supra; Mallory v. United States*, 354 *U. S.* 449, 77 *S. Ct.* 1356, 1 *L. Ed.* 2d 1479. Still less should we impose this standard on each of the 48 states as a matter of constitutional compulsion." (357 *U. S.* 509, 78 *S. Ct.* 1300, 2 *L. Ed. 2d*, at *page* 1528.)

We feel the right to question a suspect extends to a juvenile as well as to an adult, but it must be exercised with consonant circumspection, having most careful regard for the age of the juvenile, the nature of the offense, the environment and manner of the interrogation and similar pertinent factors. And we think it may be done in a police station, although where a municipality has a special police staff, with separate quarters, for juvenile matters, it is most desirable, although not vital, that it be conducted by officers so assigned and in such surroundings. More concretely, the right to question before confinement is not prohibited in cases like the present one where the suspects were close to the adult age and the criminal act involved is the most serious known to our law. Such specific right is again tacitly assumed in the opinion of this court in *State v. Vaszorich*, 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400 (1953), where was involved the matter of a confession by a 17-year-old defendant convicted of felony-murder which had been given during police questioning shortly after arrest.

We conclude there were no *per se* violations of our juvenile rules and practices in the apprehension of defendants without process and their interrogation in police headquarters before confinement in the detention center. This makes it unnecessary to consider what, if any, the effect on a conviction following later indictment would be if there had been any such initial transgressions.

Defendants' other two procedural objections may be considered together. Collectively they comprise a claim that

reversal is required *per se* because at no time did defendants receive a preliminary hearing or examination before a judicial officer as is mandatory in the case of adults charged with crime under *R. R.* 3 :2–3. This, in essence, was the only matter passed upon in the opinion of the trial court denying the motion to dismiss the indictment. 52 *N. J. Super.* 558.

There is nothing in our juvenile rules expressly making any provision for such hearings and no indication that *R. R.* 3 :2–3 is to be read in by implication. The very theory of our pattern for the treatment of juvenile offenders, previously outlined, makes it clear that such steps were never contemplated as procedurally indispensable in juvenile matters. (Note the informal practice prevailing in the District of Columbia of the juvenile judge holding an initial "detention hearing" within a maximum of five days after a juvenile is placed in a detention facility. *United States v. Dickerson,* 271 *F.* 2d 487 *(D. C. Cir.* 1959).) The basic philosophy is aimed at rehabilitation through reformation and education and not to punish. *In re Lewis,* 11 *N. J.* 217, 224 (1953) ; *cf. State v. Monohan,* 15 *N. J.* 34, 40 (1954) ; *N. J. S.* 2A :4–2. The proceeding is not the prosecution of crime. Our statute expressly says that a juvenile offender shall not be "deemed a criminal." *N. J. S.* 2A :4–39. A different course is not indicated as a matter of construction of our rules, prior to any order of transfer for criminal prosecution, simply because juveniles are to be held for an offense which might later be so handled. As has been said, there is no obligation on the police to anticipate that result as inevitable.

Even the right to preliminary hearing or examination granted to an adult charged with crime, as by our rule 3 :2–3, is not so vital that the failure to afford it will invalidate an indictment or a conviction. The right was not known at the common law and is not a constitutional requirement. *State v. Spindel,* 24 *N. J.* 395, 407 (1957) ; *State v. War,* 38 *N. J. Super.* 201 *(Cty. Ct.* 1955) ; *Kokinda v. Carty,* 30 *N. J. Super.* 253 *(App. Div.* 1954) ; *Goldsby*

*v. United States,* 160 *U. S.* 70, 73, 16 *S. Ct.* 216, 40 *L. Ed.* 343, 344 (1895); *United States ex rel. Hughes v. Gault,* 271 *U. S.* 142, 149, 46 *S. Ct.* 459, 70 *L. Ed.* 875, 877 (1926); *Garrison v. Johnston,* 104 *F. 2d* 128, 130 (9 *Cir.* 1939), *certiorari* denied 308 *U. S.* 553, 60 *S. Ct.* 107, 84 *L. Ed.* 465 (1939); see *United States v. Dickerson,* 168 *F. Supp.* 899, 902 (*D. C. D. C.* 1958), reversed on other grounds 271 *F. 2d* 487 (*D. C. Cir.* 1959); *"Prearraignment Interrogation and the McNabb-Mallory Miasma,"* 68 *Yale L. J.* 1003, *n. 2.* Occasional decisions in some of the state courts reaching a contrary result on mere bald assertions without discussion are not persuasive. See *e. g., Davis v. State,* 121 *Neb.* 399, 237 *N. W.* 297 (*Sup. Ct.* 1931); *State v. Trow,* 49 *S. D.* 485, 207 *N. W.* 466 (*Sup. Ct.* 1926). We do not, of course, gainsay the great importance of preliminary hearing and examination to advise a criminal defendant of his rights and to assure that there is probable cause to bind him over to await the action of a grand jury.

So there was no procedural, or for that matter constitutional, dereliction *per se* in the failure to take these defendants before the court for preliminary hearing, either at once upon apprehension or at the conclusion of the interrogation session. The police fully conformed with all requisites by then placing them in the Youth House and by filing a complaint in the juvenile court thereafter.

Nor do we find any defects in the hearing before the juvenile court. It came on in the usual course of the tribunal's procedure. There was no prejudice to defendants in having been detained in the Youth House in the nine-day interim. The nature of the offense charged unquestionably required detention. The police held written confessions of complete guilt of first-degree murder which at that stage were *prima facie* valid. An adult similarly charged could not have been released on bail. *R. R.* 3:9–1(*a*).

The hearing was properly confined to the question of referral of the matter for criminal prosecution. *R. R.* 6:9–7. It followed the course laid down in *State v. Van Buren,*

*supra* (29 *N. J.* 548), decided some months after it was held. Probable cause was properly held not to be in issue. The heinous nature of the offense was self-evident and no further proof was required. That in itself was sufficient to warrant transfer. The court also put the referral on the ground defendants were habitual offenders, and it is now suggested that the court should have conducted something in the nature of the taking of proofs thereon.. We find nothing in the record intimating that the court's conclusion in this respect was challenged or that any such hearing was requested. However, particularly since Stanford later filed an affidavit, supplementing the record on the motion to dismiss the indictment, in which he stated he had only been before the juvenile court on one prior occasion, we have examined all original records of the court relating to both defendants and are convinced thereby that they were unquestionably habitual offenders, and that with respect to serious offenses.

Of more significance is defendants' contention of *per se* invalidity of all subsequent proceedings because the juvenile court did not hold, immediately following its conclusion to transfer whereby they simultaneously became adult criminal defendants, a preliminary hearing to advise them of their rights and because no such hearing or preliminary examination on the matter of probable cause was ever afforded thereafter. This question was left open in *Van Buren.* As there pointed out, when referral takes place, *N. J. S.* 2A:4–15 provides that such cases "shall thereafter be dealt with in exactly the same manner as a criminal case" and *R. R.* 3:2–3 then comes into play, insofar as it may remain pertinent. *Van Buren* indicates (29 *N. J.*, at *page* 560) that the juvenile court judge should sit as a committing magistrate following his decision to refer. But that decision had not been handed down when the court acted in the instant case and the proper procedure is not at all clearly indicated by our rules. There was considerable confusion as to what course should be followed and few, if any, juvenile court

judges or prosecutors felt that preliminary hearing and examination were then required. While this is no excuse if fundamental rights are violated or real prejudice results, we are firmly of the opinion that neither occurred here. As has been earlier said, the right to preliminary hearing and examination is a creature of our rules and has no common-law or constitutional basis. Even under the federal system, where unnecessary delay in arraignment before a magistrate inhibits the admission of a confession procured during the period, illegal delay occurring only after the conclusion of the interrogation session will not bar the evidence. *United States v. Mitchell,* 322 *U. S.* 65, 64 *S. Ct.* 896, 88 *L. Ed.* 1140 (1944), rehearing denied 322 *U. S.* 770, 64 *S. Ct.* 1257, 88 *L. Ed.* 1595 (1944). Nor can we find any harm to defendants here by reason of the omission. They already had counsel and were not questioned again or subjected to any violation of rights after commitment to the Youth House. And it would be inconceivable that any judicial officer would not have found probable cause where the State had oral and written confessions. Moreover, the particulars furnished defendants prior to trial were much more complete than the State's proofs would have had to have been at a preliminary examination. So we see no merit in defendants' position either from the standpoint of bare procedural defect or fundamental unfairness.

A corollary contention may also be disposed of at this point. Stanford claims that the trial court erred in refusing to permit his counsel on summation to discuss the alleged procedural violations of the juvenile rules. The question has become academic since we have found there were no such violations and so we express no opinion upon it.

### III.

Defendants strenuously contend that the admission of the oral and written confessions was erroneous. Their position may be summarized in the language of the brief:

"We feel that the 'totality' of the conduct in this case constitutes coercion within the meaning of the Fourteenth Amendment and dictates reversal."

Again we should point out that the contentions made to us in this connection go beyond those presented in opposition to admissibility at the end of the preliminary inquiry at the trial. There the thrust was primarily on the high degree of the State's factual burden where a juvenile is involved (with which we thoroughly agree) and that it had not been met under the proofs, rather than on the broader claim of deprivation of constitutional guarantees now emphasized. We feel compelled, however, to consider the issue from the wider point of view here urged since the United States Supreme Court has clearly indicated matters of this great importance to the liberties of individuals must be dealt with completely and without any restrictions imposed by procedural niceties or rules of practice. *Blackburn v. State of Alabama,* 361 *U. S.* 199, 80 *S. Ct.* 274, 4 *L. Ed. 2d* 242 (1960) ; *Brown v. State of Mississippi,* 297 *U. S.* 278, 56 *S. Ct.* 461, 80 *L. Ed.* 682 (1936). As the same cases point out, the question must be considered on the entire record and not just the state of it when the trial judge ruled in favor of admissibility.

We may frankly say that the determination of this point has given us considerable pause, since the question is quite a close one. Our task has been made infinitely more difficult because the highly conflicting testimony on almost every phase renders it hard to conclude just what did take place at headquarters. We are constrained to comment that the obvious lack of complete truthfulness in certain aspects of the police testimony, as well as the generally inartistic method by which the written statements were prepared, is most disturbing, to say the least. Likewise, a good deal of the testimony of the defendants themselves as to what transpired is so patently extravagant and incredible as similarly to cast doubt on the reliability of their whole stories.

A brief summary of the present law on the admissibility

of confessions in the courts of this State, as we conceive it, is essential before evaluating the trial court ruling. We include in the same category at least oral statements of complete guilt as were testified to here.

Traditionally, "voluntary" confessions are to be admitted and "involuntary" ones excluded. Though the adjectives are vague and indefinite in meaning, and have had a developing connotation over the years, they remain standard judicial nomenclature as a kind of shorthand expression. The original rule was strictly a principle of the common law of evidence based on the premise of exclusion of probably, or perhaps only possibly, untrue inculpatory statements which, by reason of their dramatic nature, are likely to have a decisive effect on the trier of the facts. Wigmore phrased it this way:

"The principle upon which a confession is * * * sometimes inadmissible is that *under certain conditions it becomes untrustworthy as testimony.*

\* \* \* \* \* \* \* \*

\* \* \* the essential feature is that the principle of exclusion is a testimonial one, analogous to the other principles which exclude narrations as untrustworthy." 3 *Wigmore, Evidence,* § 822, *p.* 246 (3*d ed.* 1940).

A classic expression in our own state is found in the leading case of *Roesel v. State,* 62 *N. J. L.* 216, 226–227 (*E. & A.* 1898).

The rule meant that all involuntary confessions must be excluded, whether in fact untrue or not. The underlying psychological basis has been questioned for there is doubt whether there is a substantial danger of *false* confessions where coercion has been exerted. *McCormick, Evidence* § 109 (1954). Be that as it may, a second and sounder common-law reason for exclusion developed, even though infrequently directly so expressed in court opinions. Professor McCormick puts it in this fashion:

"Accordingly, it seems clear that while the policy on which all rules of *competency* are founded, the policy of safeguarding the trustworthiness of evidence admitted, has had an ancillary role in

shaping the rules restricting the admission of confessions, the predominant motive of the courts has been that of protecting the citizen against the violation of his *privileges* of immunity from bodily manhandling by the police, and from the other undue pressures, * * * of the 'third degree.' " (*op. cit., p.* 229.)

Professor Maguire, in his very recent comprehensive treatise on the subject, calls it a "determination to hold public authorities up to a humane and honorable standard of conduct in treatment of persons suspected or accused" (*Evidence of Guilt,* 109 (1959)), speaking of this reason as operating independently, but not at all inconsistent with the original basis of risk that a particular confession may be tainted with untruth.

The factual concept of voluntariness in New Jersey as a matter of state law, originally limited to absence of threats or violence and, perhaps incongruously, of direct or implied promises relating to some benefit to be derived by the accused, *State v. Cole, supra* (136 *N. J. L.,* at *page* 611), became expanded, undoubtedly influenced by the decisions of the United States Supreme Court shortly to be mentioned, to include persistent and protracted interrogation, mental and psychological duress and similar factors. *State v. Pierce, supra* (4 *N. J.* 252). Our present common law rests on these criteria, to be judged on all the facts and circumstances, including the nature of the interrogated individual, in the particular case. *Cf.* Rule 63 (6), *Report of the Committee on the Revision of the Law of Evidence to The Supreme Court of New Jersey* (1955), *pp.* 132–134, and *Report of the Legislative Commission to Study the Improvement of the Law of Evidence* (1956), *p.* 57.

A further most significant, and to some extent stricter, principle is now imposed by the decisions of the United States Supreme Court commencing in 1936 with the landmark case of *Brown v. State of Mississippi, supra* (297 *U. S.* 278, 56 *S. Ct.* 461, 80 *L. Ed.* 682). There violation of due process was found from admission in evidence by a state court of a confession extorted by physical violence. The

doctrine was extended to include one obtained by prolonged questioning and mental coercion by *Chambers v. State of Florida,* 309 *U. S.* 227, 60 *S. Ct.* 472, 84 *L. Ed.* 716 (1940) and *Ashcraft v. State of Tennessee,* 322 *U. S.* 143, 64 *S. Ct.* 921, 88 *L. Ed.* 1192 (1944). We need not refer to the legion of decisions since in amplification of the principle. See *McCormick, op. cit.,* § 117. Its present posture is well summarized in the latest opinion, *Blackburn v. State of Alabama, supra* (4 *L. Ed. 2d* 242).

Chief Justice Warren there said, in epitomizing the unanimous court's conclusion:

"It is also established that the Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence, whether true or false.' *Lisenba v. People of State of California,* 314 *U. S.* 219, 236, 62 *S. Ct.* 280, 86 *L. Ed.* 166 [180]. Consequently, we have rejected the argument that introduction of an involuntary confession is immaterial where other evidence establishes guilt or corroborates the confession. E. g., *Spano v. People of State of New York,* 360 *U. S.* 315, 324, 79 *S. Ct.* 1202, 1207, 3 *L. Ed. 2d* 1265, 1272; *Payne v. Arkansas,* 356 *U. S.* 560, 567, 568, 78 *S. Ct.* 844, 2 *L. Ed. 2d* 975 [980, 981]; *Watts v. State of Indiana,* 338 *U. S.* 49, 50, *note 2,* 69 *S. Ct.* 1347, 1357, 93 *L. Ed.* 1801 [1804]; *Haley v. State of Ohio,* 332 *U. S.* 596, 599, 68 *S. Ct.* 302, 92 *L. Ed.* 224, [228]. As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. This insistence upon putting the Government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar. See *Chambers v. State of Florida, supra,* 309 *U. S.,* at *pages* 235–238, 60 *S. Ct.,* at *pages* 477, 478; *Watts v. State of Indiana, supra,* 338 *U. S.,* at *pages* 54, 55, 69 *S. Ct.,* at *page* 1350.

But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. As we said just last Term, 'The abhorrence of society to the use of involuntary confessions * * * also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' *Spano v. People of State of New York, supra,* 360 *U. S.,* at *pages* 320, 321, 79 *S. Ct.,*

at *pages* 1205, 1206. Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case." (361 *U. S.*, at *page* 206, 80 *S. Ct.*, at *page* 280, 4 *L. Ed.* 2d, at *page* 248.)

Of equal importance is the concept summarized in the same opinion that the court's range of inquiry will be broad and upon consideration of the totality of the circumstances by close scrutiny of the state court record.

 There cannot be the slightest doubt that these rulings of the highest tribunal of the land are binding on every state court. So it is in the greatest degree obligatory that admissibility of confessions be tested, both at the trial and appellate levels, not only by the common-law principles of the rules of evidence, but also by the deeper requirement of "fundamental unfairness" as a question of due process. As Professor Maguire says: "Common and statutory law may well have to be remolded * * *." *op. cit., p.* 127. Trial judges are obliged to determine this federal question and prosecutors must be prepared to meet the burden in their proofs to justify admission. This court has duly recognized its paramount importance, *e. g., State v. Cooper, supra* (2 *N. J.* 540) ; *State v. Pierce, supra* (4 *N. J.* 252) ; *State v. Vaszorich, supra* (13 *N. J.,* at *page* 108). We must ever be alert, however, that recognition is not mere lip service. Review has to be both wide and penetrating to make sure these constitutional rights have not been trampled upon.

 Something should be said at this juncture concerning the effect on the problem of the requirement of *R. R.* 3 :2–3 (*a*) that one making an arrest shall take the arrested person "without unnecessary delay" before a judicial officer for preliminary hearing. Defendants urge that this obligation was violated here, and particularly since they are juveniles, that this was reason enough to exclude the confessions. Without considering the full meaning of the phrase or the

instant facts, we have already said that *R. R.* 3 :2–3 is neither constitutionally requisite nor applicable in juvenile proceedings, but we think that an analogous obligation to juveniles should in spirit exist, relating to the time interval between the taking into custody and detention in the approved juvenile facility. We have held that, as to adults, the rule requirement does not prohibit police questioning after arrest or automatically bar a confession obtained thereby even if the delay is undue (*State v. Pierce, supra* (4 *N. J.* 252)), in contrast to the opposite result rather imprecisely insisted upon in the federal trial courts on the basis of appellate supervision of inferior tribunals. See *"Prearraignment Interrogation and the McNabb-Mallory Miasma,"* 68 *Yale L. J.* 1003 (1959). But as *Pierce* said, the time period of the questioning and any delay in arraignment (here in detention) will be most carefully scrutinized for bearing on the conditions under which a statement was taken. And this factor may well weigh much heavier where juveniles are involved.

Since it bears on the scope of our review, we should also at this point go into the question of the allocation of responsibility between judge and jury on the determination of voluntariness. The question is specifically raised by defendants' contention that the trial judge erred in refusing to charge the jury to redetermine that question and to reject the confessions entirely if found to have been involuntarily given. Admissibility of evidence being a question of competency, the general orthodox rule of the law of evidence is that it is for determination by the judge alone after preliminary inquiry and is no concern of the jury. 3 *Wigmore, op. cit.,* § 861; *McCormick, op. cit.,* § 53. In some jurisdictions, however, as to confessions, voluntariness is submitted to the jury for ultimate determination under various theses of the extent of the judge's preliminary duty. Parenthetically, it may be observed that the matter is purely one of state practice and in no sense involves a constitutional question. The varying views are fully analyzed in Professor Meltzer's able

article, *"Involuntary Confessions: The Allocation of Responsibility Between Judge and Jury,"* 21 *U. Chi. L. Rev.* 317 (1954). See also *McCormick, op. cit.,* § 112. Under the so-called New York rule, involved in the much-debated case of *Stein v. People of State of New York,* 346 *U. S.* 156, 73 *S. Ct.* 1077, 97 *L. Ed.* 1522 (1953), if the trial judge concludes that only a finding of involuntariness is permissible, he excludes the confession. However, if the evidence is conflicting and a substantial question is presented, he must submit the issue to the jury, even though were he to resolve it exclusion would result. The other main variation, known as the Massachusetts view, which we take it defendants urge here, permits the judge to resolve conflicting evidence and if he concludes a confession is involuntary he excludes it. If, however, he considers it voluntary and the proofs are in conflict, he admits but instructs the jury to disregard if it is satisfied it was not voluntary.

New Jersey for many years vacillated between the orthodox rule and that of leaving the issue to the jury, commencing with *dicta* pointing to the latter view in *Roesel, supra* (62 *N. J. L.,* at *pages* 236–239) and *Bullock v. State,* 65 *N. J. L.* 557, 567–568 (*E. & A.* 1900). The confusion was definitely set at rest in favor of the orthodox rule in *State v. Morehous,* 97 *N. J. L.* 285 (*E. & A.* 1921), which has been frequently reiterated since, *e. g., State v. Yarrow,* 104 *N. J. L.* 512 (*E. & A.* 1928); *State v. Compo,* 108 *N. J. L.* 499 (*E. & A.* 1931); *State v. Cole, supra* (136 *N. J. L.,* at *page* 612); *State v. Tune,* 17 *N. J.* 100, 114 (1954), *certiorari* denied 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955). The law of this State definitely is that the determination of voluntariness is for the court alone. See *Report of the Committee on the Revision of the Law of Evidence, op. cit.,* *pp.* 17–18, and *Report of the Legislative Commission, op. cit.,* *pp.* 18–19. There are some expressions in several recent cases which on cursory reading might suggest a re-creation of uncertainty, *e. g., State v. Cleveland,* 6 *N. J.* 316, 326 (1951); *State v. Vaszorich, supra* (13 *N. J.,* at *pages*

109–110); *State v. Walker,* 15 *N. J.* 485, 492 (1954). Careful analysis indicates, however, that such statements were generally made in the light of a charge given by the trial court, as in *Cleveland,* that if the jury found the confession to be involuntary, it was to disregard it. This instruction, somehow frequently given despite the settled state of the law, was erroneous, but, since favorable to the defendant, furnished no ground for reversal. *State v. Foulds,* 127 *N. J. L.* 336, 339 (1941). We are familiar with no case, decided since *Morehous,* where a refusal to give such a charge, the precise question here presented to us, was held to be reversible error. *E. g., State v. Compo, supra* (108 *N. J. L.,* at *page* 502). The trial court was correct in the instant case in refusing the requested instruction.

The writer believes the orthodox rule sound and to be preferred, quite apart from the claim that any departure from it must be condemned purely on the ground of theoretical "heresy." See 3 *Wigmore, op. cit.,* 346. The meritorious reasons in support cannot be better expressed than has been done by Maguire:

"One ground—indeed the historic primary ground—for being cautious about admission of confessions is that some of them are potentially delusive and carry high peril of undue prejudice. It is advisable to screen out such proofs lest exposure to them corrupt the reliability of verdicts. Plainly enough the surest way to screen is to have the judge, and the judge alone, determine all preliminary facts affecting acceptability. The very worst way to conduct the safeguarding job is to make conditional disclosure of a challenged confession to the jurors, with instructions that they are to put it out of mind unless while considering their verdict they incidentally find the confession to have been voluntary. Yet precisely this is done in several American jurisdictions, notably New York.

As already remarked, there is another reason than fear of incredibility for excluding many involuntary confessions—namely, desire to enforce decently restrained behavior by peace officers. Here again, if we are to have a reasonably consistent pattern of enforcement sanctions, it is wiser to depend upon judges whose business in life is systematic administration of discipline under law than to depend upon jurors who are no more than courtroom novices.

Reverting to the suggestion which opened this discussion, no scrutinizable record of the determination to admit a challenged con-

fession as voluntary will ordinarily be kept if the issue is turned over to a criminal jury to be merged in a general verdict. Indeed it will become impossible in most cases to tell whether the jury frankly admitted the confession, or only surreptitiously peeped at it, or stanchly attempted the highly difficult task of completely ignoring it. Such is the practically inevitable consequence of the general verdict in the immediate connection. And it is no light matter to interfere with the traditional power of a jury to return a general verdict in a criminal prosecution." (*Evidence of Guilt*, at *pp.* 130–131.)

It might be added that the recently mandated consideration of the broad Fourteenth Amendment questions can only be properly handled by a judicial mind and not by jurors who are, of course, laymen. The suggestion has also been made that the defendant receives more protection under the Massachusetts rule, despite the fact that it seems too much to expect an untrained jury to separate the issues of voluntariness and ultimate guilt, because he gets two cracks at the former issue. McCormick has supplied a realistic answer in his comment on that rule: "This may seem a sufficient safeguard, but in practice it may seriously weaken the judge's responsibility. He is reluctant to brand the officers who took the confession as liars and he is encouraged to admit a doubtful confession by the rule which says that if he admits it the jury must pass on the same question." *op. cit., p.* 234.

A defendant receives ample protection under our rule when the jury is permitted to consider, as the trial judge fully charged here, all the evidence received on the preliminary inquiry as to voluntariness which it may be permitted to hear in carrying out its proper function of determining the weight and credibility it will give the confession. While at first blush this might sound like in fact putting voluntariness to the jury in different language, this is not in reality so. The emphasis and issue are quite different; for a jury can legitimately believe, as a matter of credence, a confession which it might think to be involuntary but which the judge has found not to be, as for example where there is a substantial amount of corroborative evidence. On the other

hand, it may well disbelieve a confession admitted in evidence, as one which is claimed to be the product of hallucination, the voluntariness of which is conceded.

A word of caution for future guidance in one particular is appropriate. A trial judge who has decided to permit a confession in evidence should not tell the jury that he finds it to be "voluntary." Such may have the potentiality of conveying too much to a lay jury in certain situations. The judge should confine himself to saying that he finds the statement to be admissible. While "voluntary" was so used here, no objection was made at the trial or in the briefs before us and we are not convinced that it resulted in actual prejudice, especially in view of the thorough instructions given on the jury's exclusive duty to determine the credibility and weight to be accorded the statements.

The scope of review in this State of a trial court's determination of admissibility must be coextensive with all the rules and principles we have discussed. The frequent shibboleth found in our decisions that the determination of the trial judge on this issue will ordinarily not be disturbed where there is sufficient evidence to support it (*e. g., State v. Rios,* 17 *N. J.* 572, 600 (1955)) must mean, in view of the wide range of inquiry insisted upon by the United States Supreme Court on the constitutional issue, that we will carefully review and weigh all the evidence on the question and determine its adequacy and the correctness of the determination in the same fashion as we do in the case of an appealed judgment in a non-jury criminal matter, giving full regard, of course, to the opportunity of the trial court to judge of the credibility of the witnesses. *R. R.* 1:5–4(*b*); *State v. Taylor,* 38 *N. J. Super.* 6, 21 (*App. Div.* 1955). Such was essentially the approach employed in two earlier cases. *State v. Cole, supra* (136 *N. J. L.,* at *page* 611); *State v. Morehous, supra* (97 *N. J. L.,* at *page* 292).

So we finally reach evaluation of the ruling of admissibility in the light of the evidence. As has been indicated, the question has troublesome aspects. It is not necessary to

recite in detail all the proofs. Moreover, to do so would extend beyond all proportions an opinion already lengthy because of the number and depth of the points raised. The testimony on the preliminary inquiry consumes more than half of the trial transcript and, in addition, some evidence subsequently introduced also must be considered as casting further light on the course of events at police headquarters. We have thoroughly dissected all of it and have reached the conclusion that we cannot disagree with the conclusion of the trial judge. The evidence is so conflicting in such great part that the finding has to turn primarily on credibility and the conclusion of the one who saw and heard the witnesses should be given controlling regard unless very clearly erroneous. What proofs there are of an undisputed character, direct or inferential, lean to support the State's version. On our review of the cold record, we find no sufficient reason to quarrel with the conclusion that the weight of the proofs was in favor of voluntariness, nor can we discover any credible proof of violation of due process of law.

Initially it is to be remembered that seldom will one being questioned about a serious offense immediately and spontaneously admit his guilt, even when inculpating facts may be weighty against him. An interrogation, no matter how conscientiously conducted, is naturally bound to be a tense occasion and to evoke apprehension, nervousness and a sense of pressure, no matter what the situation, which will be heightened in a person who knows he is guilty by consciousness of guilt and fear of the legal penalty. It must be recognized that it is not this kind of normal stress, fear and pressure which can make the questioning unfair and a confession involuntary. *State v. Cooper, supra* (10 *N. J.,* at *pages* 551–552) ; *State v. Pierce, supra* (4 *N. J.,* at *p.* 261).

The thesis of the State's proofs of events at headquarters was, although its evidence was not entirely consistent, that defendants, questioned in separate rooms following arrival at 4 P. M., at first denied any connection with the crime, but within from one to three hours Stanford admitted complicity

and related the details shortly after a detective told him Parker had recounted defendants' statements to him the morning after the killing. When Smith was then told of Stanford's oral admissions, he maintained Stanford was not telling the truth and denied even having been with him at all that night. About 9 P. M., however, he orally confessed his guilt following confrontation with the result of outside checking with family and friends as to claimed whereabouts on the evening in question, made by some of the detectives in the interim between 6 and 9 o'clock, which had established that they had been together. When Stanford was told Smith denied being with him, the former is reported to have said that he was not going to "take the rap" for Smith and that his girl friend (Betty) could verify their having been together. It was clearly established that she as well as Smith's wife was among those interviewed during the interval. Part of this time was also taken up by the detectives and defendants eating. The remainder of the time until the confessions were finally signed about 1:30 A. M. was said to have been consumed in trying to iron out discrepancies in details (which, as can be seen from the statements, was never successfully accomplished) and in composing, typing, reading and signing the written statements. The preparation of the latter commenced about 11 o'clock and the two were done successively. The detectives all vigorously denied any physical violence, threats, coercion or promises.

The burden of defendants' testimony, at complete variance with that of the police officers and largely imprecise as to times and chronology of events, was that at no time did they admit any guilt or knowledge of the crime, but on the contrary continually denied connection or presence at the scene. Both admitted their signatures on the written statements, but said they did not read them nor were the contents made known to them. They conceded, however, on cross-examination during testimony on their own case, having told the detectives substantially everything set forth therein

except the sentences describing the commission of the crime. Smith's testimony was particularly confusing concerning the circumstances of placing his signature. He claimed that he never signed a paper with typing on it and in the next breath that the typewritten paper he did sign was misrepresented as something necessary to bring about his release from the Youth House the next day. Stanford said he signed his statement willingly but on the assurance that if he did, he would be released from the detention facility in a couple of days, and understood it contained only what he told the detective about his background and what he maintained he did on the evening in question. Significantly, both also conceded that a detective was typing while they were answering questions in the latter part of the evening.

Both asserted they were continuously questioned by relays of detectives and insisted that, almost from the beginning of the interrogation, they were constantly threatened with physical harm and actually kicked, pushed to the floor, struck with a rubber hose and a short board and hit with open hand and fists. Smith, who was particularly extravagant on cross-examination, claimed to have been punched with a fist 40 or 50 times in the face and mid-section. Both admitted, however, that despite the severity of the asserted violence, they sustained no injuries except claims of sore ribs, abrasions on Smith's knees and hands and cuts inside his mouth. Their effort to corroborate even such limited consequences through testimony of members of the Youth House staff was on its face ineffectual and unpersuasive. They also denied they were given anything to eat during the questioning.

Defendants were brought to the squad room by three detectives. This room is the headquarters of the officers assigned to the homicide and bandit squads of the city. It is large, with many desks, chairs and benches, and ordinarily a busy spot with detectives, suspects and arrested persons, witnesses, newspaper reporters and others coming and going at all hours. There was also a small room entered from it. According to the detectives, Smith was placed in the small

room and Stanford in the main one and they remained so separated during the questioning until brought together in the large room after both confessions had been completed. The questioning at the outset was done by these three detectives. They were joined after an hour or so by a fourth, Detective Norris, who it may be noted is a Negro (as is the sergeant who was in charge and present throughout although taking no direct part) to whom it was said Stanford first made his oral admission. All were experienced law enforcement officers. These four continued the interrogation although none was there throughout the entire period and only for a short time before 7 P. M. were all there at once. One says he questioned only Stanford; the others talked to both boys, but it is not clear that all three were together when this was being done. They said they went back and forth between the two rooms questioning each defendant successively as matters developed. Their presence was interrupted to eat and to make the outside investigations referred to or was terminated by the conclusion of their tours of duty at varying hours during the evening. All were positive that Stanford's admissions were made at least by 7 P. M. and Smith's by 9 o'clock. Norris testified that he was the one who actually composed and typed the written statements and supervised their execution. He was joined some time after 10 o'clock by a lieutenant (a lawyer) and an investigator from the county prosecutor's staff who seemingly were called in after Smith had confessed to assist in the taking of the written statements for later court use. They remained with Norris until the end.

We have indicated some of the police testimony has disturbed us. All five of the city officers testified that no adult under arrest or held as a suspect was present in the squad room while defendants were there and specifically that David Parker was not in the police car when they were picked up or present at any time during the questioning. Defendants and Parker all testified to the contrary and said that not only were several arrested adults in the squad room from

time to time, but also that Parker was there for a considerable period and defendants were separately confronted with him in the small room during the early questioning. This testimony was convincingly corroborated by that of a newspaper reporter and a photographer who took Parker's picture in the large room about 10 o'clock. Also, the sergeant in charge, in corroborating the testimony of the other officers, testified that defendants first denied connection with the offense and later admitted it. He was confronted with an affidavit he had given in connection with the pretrial motion in which he had said defendants at all times divulged freely the incidents which had occurred and was forced to concede the affidavit statement was not true. The giving of such obviously incorrect testimony by police officers is to be especially deprecated and cannot help but raise other doubts.

Nonetheless, we feel certain, as the trial judge obviously did, that there was no basis in fact for defendants' charges of physical violence and threats. Their testimony along this line seems entirely incredible and we feel certain nothing of the kind actually occurred.

Nor can we put any stock in their story that they did not make the oral admissions which have been recounted or tell Detective Norris what is contained in the written statements. Likewise we feel convinced the latter were signed with full knowledge of the contents and were prepared and executed as Norris and the prosecutor's men said they were. This testimony was to the effect that Norris composed each statement successively, in the presence of the county investigator, while seated at a typewriter, asking the particular defendant questions and then reducing the answers to sentence form, typing as he went along. The result is, of course, not *verbatim* quotation of the subject and the final language is that of the typist. We may say that this is not a desirable method of taking a confession. The person's own words are most important and such can best be assured by a fairly conducted question and answer interrogation taken down stenographically and then transcribed by a

qualified reporter. This was the practice followed in the recent cases of *State v. Lucas, supra* (30 *N. J.* 37 (1959)); *State v. Mount*, 30 *N. J.* 195 (1959), and *State v. Johnson, supra* (31 *N. J.* 489 (1960)).

The three officers all said that each confession (on a single sheet) was completed to the last sentence and left in the respective typewriters. After both were so finished, each was read aloud by the respective defendant, in the presence of one of the officers, who then also read it aloud. After this, any corrections dictated by the defendant were made and the last paragraph was typed reciting that the reading had taken place, that the contents were understood by the defendant and that "it is the truth." Then the sheets were removed from each machine, signed, witnessed and sworn to in duplicate before the investigator. Following this the boys were brought together in the large room and each read his statement aloud, for the second time, in the presence of each other and the officers. They were asked if they had anything further to say and replied that they did not. We have no reason to doubt that these standard mechanics of confession execution were followed here, just as testified to, under the supervision of the long-experienced prosecutor's representatives.

 This leaves us with the question of whether the confessions were nevertheless the product of "sustained pressure" by reason of alleged protracted and persistent questioning amounting to mental or psychological coercion and unfairness in the due process sense. We are most mindful that we must look at the question in the light of the age, intelligence and experience of the particular defendants as well as of the period of time involved and how that time was utilized. *Haley v. State of Ohio,* 332 *U. S.* 596, 68 *S. Ct.* 302, 92 *L. Ed.* 224 (1948). Dealing with the time element, the question turns on when the oral admissions of complete guilt were first made. We think the State's version is credible and to be accepted despite our disturbance at some of the police testimony. We see little

problem as to Stanford even if we accept nearly three hours as the period of questioning at the end of which he made the admission. We do not conceive such a period of interrogation to be too long, even of a 17-year-old, and the questioning here was not continuous. There were interruptions, even before 7 o'clock, while the detectives went in the small room to talk to Smith.

As to Smith, we are satisfied that 9 o'clock should be accepted as the time when he finally admitted guilt. But he was not subjected to continual interrogation for the preceding five hours. For the first couple of hours, his situation was the same as Stanford's. There was an interval for eating and Smith's persistent claim of alibi even after being told of Stanford's admission resulted in a further lapse in questioning while the story was checked. (That such lapses occurred is to be gathered as well from defendants' own testimony.) So in Smith's case as well, the period was not too long under these circumstances. It is quite proper to take a reasonable time to investigate stories told by suspects, to confront them with those who have implicated them and for similar purposes. *Cf. Goldsmith v. U. S., supra.* Further, we are not convinced that as to either one the nature of the interrogation amounted to duress or unfair treatment. Nor is invalidating effect to be ascribed because additional time was taken to try to resolve minor discrepancies in the admissions or was necessary to reduce them to writing and have them properly executed. And it is undisputed that once that had taken place here, defendants were immediately taken to the Youth House and were freely visited thereafter by family and attorneys.

Mention should be made of the testimony given by the newspaper reporter previously referred to, who was in and out of the squad room several times during the evening and who was called as a witness by defendants. It buttresses the State's version. He said that when he dropped in on one occasion he saw four or five colored boys in the squad room. One of the defendants, he could not be certain which

one, was being questioned and was smiling and making faces at some of the others during the process. He was startled when an officer told him this boy had admitted shortly before that he had participated in the killing of Mr. Dellorto. When he dropped in again late in the evening, one of the detectives was reading a statement to one of the defendants and he saw him sign it. He saw nothing untoward about the boy's condition.

Looking at defendants' personal side, there is nothing to show they were subnormal in intelligence for their age. All indications point to the contrary. There is no suggestion made that this interrogation was a novel experience for them, probably because the juvenile court records earlier mentioned show frequent contacts with the police and courts and the giving of statements in the past.

The totality of the circumstances here did not amount to involuntariness or violation of due process.

The judgment is affirmed.

WEINTRAUB, C. J., and JACOBS, FRANCIS and SCHETTINO, JJ. (concurring). We join in the opinion of Mr. Justice HALL except insofar as it holds a jury should not be instructed to *disregard* a confession the jury finds to be involuntary. No doubt the rule in this jurisdiction at the time of the trial was as stated by Mr. Justice HALL although individual trial judges have charged differently and at one time, as Mr. Justice HALL points out, this State accepted or inclined to a view much resembling the one we believe to be sound. *Roesel v. State,* 62 *N. J. L.* 216, 236–239 (*E. & A.* 1898); *Bullock v. State,* 65 *N. J. L.* 557, 567–568 (*E. & A.* 1900). There are a number of competing views, each of which commands respectable authority. The question is not whether the rule applied in this case is demonstrably wrong or unfair. Indeed that rule, adopted by our predecessors after conscientious consideration and embraced by three members of the court, is supported by the numerical weight of decisions elsewhere. Although we may prefer a

given approach, we cannot reasonably maintain that ours is the single sound view of the matter. In these circumstances, we are unable to hold there was error in this case and hence we join in an affirmance. Since, however, we, a majority of the court, do prefer another approach, we are stating our views for the future guidance of the trial bench.

■■■ On the theoretical plane, it is said that voluntariness goes to the "competency" of the testimony and hence it would offend logic to direct a jury to "reject" evidence the court has admitted. We question the premise. The issue of voluntariness relates to the subject of credibility rather than competency as those terms are generally used in allocating the duties of the judge and jury. An involuntary confession may not be used, among other reasons, because of the probability that the end-product of a coercive process is unreliable and unworthy of credit. The ultimate issue, factual in nature, is whether the confession was involuntary. That factual issue is indistinguishable from any other factual dispute within the traditional province of the jury. Hence, abstractly, the issue of voluntariness should be for the jury with appropriate instructions whenever men may reasonably differ with respect to the decisive factual claims. This is the rule in New York. *Stein v. People of State of New York,* 346 *U. S.* 156, 73 *S. Ct.* 1077, 97 *L. Ed.* 1522 (1953). A weakness in that approach is that the jury may find the confession involuntary and still be swayed by its contents. To prevent that prejudice, it is appropriate to assign a larger role to the trial judge, *i. e.,* to determine *initially* whether the confession is involuntary. Perhaps the rule applied by the trial court in the present case was born of a desire to avoid such prejudice. See *Maguire, Evidence of Guilt* (1959), § 3.061, at p. 130. If the purpose was thus to add to the protection of a defendant, "logic" hardly requires a diminution of the role of the jury as trier of the facts by making the court the *exclusive and final* judge of involuntariness.

Incongruity is claimed in the phenomenon of a jury "reviewing" the finding of the court. An incongruity exists only if one accepts the premise we question, namely, that the issue is one of "competency" of evidence. Indeed, if "competency" were really involved, it would logically follow the court should instruct the jury that it has found the confession to be voluntary and that the jury must accept the judge's finding in assaying its evidential worth. Perhaps on that premise all evidence relating to involuntariness should be kept from the jury upon the thesis that only the court is concerned with it. Our cases do not go to that length, and quite obviously because a charge to that effect might be tantamount to a direction of a verdict of guilty since in the ordinary case there is no reason to disbelieve a voluntary acknowledgment of guilt. Rather, under the doctrine applied in this case the jury is told it may consider all the circumstances surrounding the taking of the confession in determining whether to believe it. Those surrounding circumstances include the same controverted factual claim of coercion or other impropriety passed upon by the court. 3 *Wigmore, Evidence* (3d ed. 1940), § 861. Thus the jury is permitted to "review" the judge's finding, but with the anomalous result that whereas a judge's finding of involuntariness would require the confession to be excluded without regard to its truth, yet a jury could give decisive weight to a confession it believed to be involuntary. We find it difficult to understand why due process of law should mean one thing in the hands of a judge and something else in the hands of a jury. The error, we believe, stems from the unwarranted assumption that analytically "competency" of proof is involved whereas as we have already said the more tenable reason for the judge's added role is the greater protection of the defendant.

 We believe both judge and jury should operate upon the same standard. The judge should himself try the issue of voluntariness in the preliminary hearing and should exclude the confession if the State fails to prove it to be

voluntary, and if he admits it into evidence, he should strike it if at a later stage involuntariness should appear. If the confession is admitted and there is proof as to involuntariness upon which reasonable men may disagree, the court should charge the jury first to consider that issue under instructions outlining the controlling legal principles and to disregard the confession if it finds the ' State has not proved it to be voluntary. The jury should not at any time be informed of the trial court's finding of voluntariness.

It is said that if the judge's role is not made final and exclusive, he may shirk his responsibility and abdicate in favor of a jury decision. *Meltzer, "Involuntary Confessions: The Allocation of ʿResponsibility between Judge and Jury,"* 21 *U. Chi. L. Rev.* 317, 329 (1954). If this be so, the prospect is equally great under the rule we disapprove. We are far from confident that the rule has operated with the perfection attributed to it. At any rate, we are satisfied that justice is better served by the enjoining of both court and jury each to make original findings and to abide by the command of due process that an involuntary confession must be rejected without regard to the truth of its contents.

WEINTRAUB, C. J., and SCHETTINO, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.